Dawn F. MUNDAY

v.

**WASTE MANAGEMENT OF NORTH AMERICA, INC., et al.**

Civ. No. K–92–467.

United States District Court,
D. Maryland.

Aug. 4, 1994.

Harold R. Weisbaum, Charles J. Goetz, III, and Blum & Weisbaum, P.A., Baltimore, MD, for plaintiff.

Russell H. Gardner, Ann L. Lamdim, and Piper & Marbury, Baltimore, MD, for defendant.

FRANK A. KAUFMAN, Senior District Judge.

In the within case plaintiff, Dawn Munday, asserts that her employer, defendant Waste Management Company of Maryland, violated Title VII, 42 U.S.C. § 2000e, *et seq.,* and breached a settlement agreement between her and her said employer. The case was tried before this Court, without a jury.[1] At the conclusion of trial, this Court heard oral argument of counsel, originally took this case under advisement on July 18, 1994, and later, with the concurrence of all counsel, held the record open for additional evidence regarding damages incurred by plaintiff to and including July 26, 1994. In the light of the entire record in this case, and in accordance with applicable law, this Court hereby makes the following findings of fact, reaches the following conclusions of law, and determines that plaintiff is entitled to judgment to the extent set forth herein.

### FACTS

Dawn Munday was hired by defendant Waste Management of Maryland, Inc., located in Elkridge, Maryland, in December, 1986. Defendant primarily operates a waste collection company. Until May, 1987, Munday worked as a truck dispatcher for defendant. In May 1987, the general manager of the Maryland facility, Robert Bohager, transferred Munday to Waste Management, Inc. of Greater Washington. While Munday asserts that she was transferred involuntarily, Bohager claims that when presented with the option to transfer voluntarily, she chose to relocate because the Greater Washington facility presented greater advancement opportunities.

After six months at the Greater Washington facility, and a promotion to a supervisory position, Munday decided to leave the Washington facility. She states that the commute to the Washington facility from her home in the Baltimore area was simply too long for her; however, defendant suggested at trial that Munday had had problems complying with directions of the management at Greater Washington. After briefly working for a competitor of defendant, Munday called Bohager seeking to return to the Maryland facility. Bohager hired her as a truck driver in August of 1988, after warning her that her job duties would be tough ones. Subsequently, Munday began to experience what she perceived to be sexual harassment and discrimination.

At trial, Munday testified to a number of alleged acts of sexual harassment, including the following, which occurred prior to May 30, 1989. First, John Utterback, a dispatcher at the Maryland facility who kept the key to the women's bathroom, regularly denied Munday access to the bathroom, which was the only women's bathroom on the premises. Moreover, Utterback repeatedly made comments to her such as, "How bad do you have to go?", and "Can't you hold it in?". Second, she received less pay than her male co-workers. Third, when she asked to have extra work assigned to her, Fred Heider, her immediate supervisor, remarked that she had "one strike against her because she was a

---

1. Originally, plaintiff asked for a jury trial in this case. Later, that jury demand was dropped. In any event, the parties agreed prior to trial that the trial should be nonjury in the light of the Supreme Court's decision in *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994). At the time the parties so agreed, it is only fair to state that the focus of Court and counsel was on the Title VII aspects of the complaint in this case. The question of whether or not a jury trial was available in this case in connection with one or more of the breach of contract claims stated by plaintiff, *see*

*infra* Part IV, was seemingly not considered by Court and counsel prior to trial. *See Snider v. Circle K Corp.,* 923 F.2d 1404, 1408 n. 1 (10th Cir.1991); *Perdue v. Roy Stone Transfer Corp.,* 690 F.2d 1091, 1095 n. 8 (4th Cir.1982). In view of the agreement of Court and counsel prior to trial that the case would proceed nonjury, this Court need not reach in the post-trial setting of this case the question of whether or not plaintiff would or would not have been entitled to a jury trial in connection with any of the alleged breaches of contract in this case.

woman" and that she should not be in her job "taking food out of the mouths of men." Fourth, when she was assigned additional work, more often than not, her pay was not adjusted to compensate her for the added undertaking until she complained of the same. Fifth, her paperwork, including her route and schedule, was constantly placed in the "driver's lounge," which was in actuality the men's changing area and bathroom. Sixth, drivers and dispatchers made comments and jokes over the two-way radio installed in every truck, including comments that Munday was "on the rag" and "under sexual pressure."

On May 30, 1989, Munday arrived for work and discovered that her regularly assigned truck had not been dumped by the previous day's driver and therefore would only have half its normal packing capacity. Utterback offered her a choice of two other trucks, neither of which Munday found satisfactory for various reasons. Despite Utterback's instructions to Munday to wait at the truck dispatch site for an available truck, Munday walked off the job and said she was going home, informing the dispatcher to telephone her when the company had a truck in proper operating condition.

The events described above were brought to Bohager's attention during the afternoon of May 30, 1989, by the Operations Manager, Nicholas Zurkan. Bohager and Zurkan properly concluded that Munday's actions constituted insubordination. They held a meeting that day with Munday to afford her an opportunity to explain her actions, and then informed her that company policy dictated that termination was their only recourse for an employee who walked off the job. As a result of the above events, Munday filed a claim of sexual harassment and discrimination with the Howard County (Maryland) Office of Human Rights.

Robert Coggins, an investigator for that office, notified the defendant of Munday's complaints, mailed defendant a letter of inquiry, and began his fact-finding investigation in March, 1990. Other employees informed Coggins that Munday was constantly the subject of jokes and that her paperwork was often left in the men's changing area. Fred Heider, Munday's immediate supervisor, initially told Coggins that he had been admonished during a meeting with Bohager and Zurkan for his comments to Munday regarding the "one strike" against her and "food out of the mouths of men." However, Coggins testified that Heider later stated to Coggins that no such meeting had ever been held, that Heider had never been reprimanded, and that Heider was not willing falsely to testify under oath.[2]

2. According to Munday, Heider was the person who had, on one occasion, told her that she "had one strike against her" and that she should not be a driver "taking food out of the mouths of men." Munday reported that comment either to Bohager or Zurkan and was subsequently told by Zurkan that Bohager and Zurkan had met with Heider and reprimanded him for that comment. Munday asked for written confirmation of that reprimand and received a letter to that effect dated March 20, 1989. After Coggins commenced his investigation, Bohager, Zurkan and Heider told Coggins that the meeting had taken place and that Heider had been reprimanded at the meeting. However, Coggins testified that prior to the commencement of the administrative hearing by the Howard County authorities, Heider had told Coggins that no such meeting had taken place and that Heider was not prepared to testify falsely under oath.

Kenneth Murdock, who was present at defense counsel table throughout the trial as the representative of defendant pursuant to Fed.R.Evid. 615(2), testified on direct examination, after hearing the testimony of Coggins, that Heider had never told him that Heider had lied about the meeting. However, on cross-examination, after being shown the transcript of his pre-trial deposition testimony, Murdock admitted that he remembered that Heider had told him of the alleged lie prior to the commencement of the Howard County administrative proceeding. When this Court asked Murdock how he could have failed on direct examination to remember what Heider had so told him, Murdock gave no clear answer to the question. Nor did Murdock state whether or not he had investigated Heider's admission to him, talked with Bohager and/or Zurkan about the same, or whether the defendant and its officials had considered what disciplinary action, if any, to take in connection with Heider's alleged lie or whether the meeting or reprimand had ever been held or given. The record simply reveals that during September of 1991, Heider was terminated because he admitted, after Munday had lodged a separate, further complaint with Bohager, that Heider had, contrary to Bohager's instructions, questioned Munday concerning the details of her April 19, 1991, settlement arrangement. *See* the discussion of

Based upon the outcome of Coggins' investigation, the Howard County Office of Human Rights issued a reasonable cause letter in June of 1990. As a result, the Howard County Human Relations Commission scheduled a hearing in the Spring of 1991. After that hearing commenced, and just before Heider was to testify, the parties reached a settlement agreement. Pursuant thereto, the defendant agreed, *inter alia*, to expunge Munday's May 30, 1989 discharge, to reinstate Munday, to provide appropriate restroom facilities, and not to engage in any retaliation against Munday for her filing of a sex discrimination complaint with the Howard County authorities.[3]

After the settlement agreement was signed, Munday and defendant agreed that Munday would return to work on July 8, 1991. Prior to her return on that date, defendant held a safety meeting on June 20, 1991. Bohager and Chad Johnson, the Operations manager at that time, attended the meeting, as did Heider, Ed Stevenson (another supervisor), and approximately 30–35 drivers. At the meeting, Johnson informed the drivers that Munday would be returning

to work and that defendant would not tolerate bad language, taunting, or sex-oriented rumors concerning Munday. Bohager then addressed the drivers. According to the testimony of Johnson and a driver named Brian Flynn, Bohager told the assembled drivers to have as little to do with Munday as possible and not to socialize with her as they did with other drivers and had done with Munday prior to her May 30, 1989, discharge. In contrast, Bohager and David Campbell, another driver, testified at trial that Bohager only informed the drivers that they were not to talk to Munday concerning the terms of her settlement with defendant.

Upon Munday's return to work, defendant had processed little if any of her paperwork, had not conformed her pay rate to the rate agreed upon at settlement, had not activated or brought up to date her medical benefits, and had not ordered her a uniform. All of those problems were eventually straightened out, largely with the assistance of Johnson upon his return from vacation on July 15, 1991. At trial, Munday also stated that upon her return to work, the new women's bathroom facility was located in a trailer in an

the same, *infra*, in the body of this opinion. Counsel for both sides informed this Court that they had not been able to locate Heider so as to subpoena him to testify at trial.

Coggins testified at trial that he found Heider's statement that no meeting had been held more credible than the statements of Bohager and Zurkan to the contrary. Under all of the circumstances, so does this Court. Coggins based his opinion concerning such credibility not only on the Heider incident, but also on what he perceived to be non-truthful statements made to him by Bohager and/or Zurkan concerning an occurrence which was related to whether or not a particular dump in the City of Baltimore was open at a particular time over a specific weekend. That factual dispute arose in connection with the complaint by Munday that, on one occasion, the truck assigned to her for use on a particular day was already partially loaded with refuse which should have been dumped. *See* the discussion, *supra*, in the body of this opinion. The totality of the evidence indicates, however, that the dump was, indeed, closed at the time Bohager and/or Zurkan stated that it was closed. Accordingly, in this Court's view, Coggins' opinion concerning lack of credibility of Bohager and Zurkan was not justified with relation to the dump issue. However, in this Court's view, Coggins' opinion was more than justified with relation to the Heider matter.

3. Murdock testified that, as the regional human relations counselor of defendant for the eastern section of the United States, including Maryland, he advised his superiors that the company should be able to win the Howard County case and therefore should not settle it. However, Munday, prior to the time the Howard County administrative hearing commenced, had apparently engendered considerable publicity for herself concerning her claims of sex discrimination by defendant. Against that background, top national officials of defendant's parent company, determined that, if possible, Munday's complaint should be settled and not litigated to conclusion before the Howard County authorities. While Murdock testified that he understood the reasons for that decision—despite his disagreement with it—and Bohager testified that he had no opinion one way or another as to whether the settlement should have taken place, the demeanor of both Bohager and Murdock during trial leads this Court to conclude that both Murdock and Bohager, and particularly the latter, were most disturbed by the Settlement Agreement. This Court further concludes that Bohager determined that when Munday returned to work, Bohager would, without getting himself into trouble, handle Munday in such a way that she would find work sufficiently unpleasant and would, given sufficient passage of time, herself determine not to continue her employment by the defendant.

unsafe, dark area, lacked proper supplies, and was not hooked up to the water supply. The bulk of her complaints to defendant concerning the bathroom facilities were eventually remedied. Munday also contended that upon her return other drivers refused to talk to her, going so far as to ignore her greetings. Munday stated that at one point certain drivers apologized for not talking to her and told her that Heider had ordered them not to speak to her. At least one employee told Munday that Bohager had instructed other employees to report back to Bohager anything which Munday said to any of the employees. At trial, Bohager denied having given such instructions to the other drivers; however, Bohager's somewhat angry and rather clearly resentful demeanor at trial, combined with his uncooperative behavior during discovery of this case, and his testimony concerning the Heider incident related in footnote 2, *supra*, causes this Court largely to discredit Bohager's testimony regarding his instructions to the other drivers and regarding certain other parts of his trial testimony.

On July 26, 1991, Munday was driving with Heider. Throughout the day, Heider badgered her with questions concerning the amount she had received in her settlement. Heider also informed her that Bohager had instructed the other drivers "not to talk to the bitch," and that Bohager had told Heider that he wanted to get rid of Munday before she could "retire on the company." After completing her assigned route, Munday attended a previously scheduled meeting between herself, Bohager, and Johnson. Munday and Johnson believed that the meeting was scheduled to address Munday's numerous aforementioned complaints. However, at the meeting, according to Munday and Johnson, Bohager exploded at Munday, yelling that he had heard a rumor that Munday had stated that she would be suing defendant again. He demanded that she admit such an intention. Munday denied that she had made any such statement or had any knowledge of the rumor. When she attempted to get Bohager to address her concerns, Munday testified that Bohager stated that he

"didn't give a shit," about her problems. Bohager denied such yelling and such statement. This Court, however, credits as credible the version of the meeting related by Munday and Johnson.

Munday was placed on off-work status by her physician from August 1991 until March 1992. During that time, Munday had numerous difficulties securing her disability benefits, all of which were eventually resolved. On January 30, 1992, Munday called a fellow employee, Dolly Fotta, and recited to Fotta her litany of woes concerning her employment with defendant, particularly her problems with her medical insurance. During that conversation, Munday stated that she could relate to incidents recently publicized in the media concerning employees who had shot their employers. Fotta called Murdock and Dennis Van Every, the Regional Operations Vice President, and informed them of the details of her conversation with Munday.

Munday's physician gave her a return to work slip effective March 11, 1992. Bohager did not permit plaintiff immediately to return to work; rather, he stated that she must have an independent medical and psychological examination conducted by doctors selected by defendant. Munday contends that no male employee ever had to have an independent medical examination upon the end of a disability period, but that an employee could simply get a treating doctor to vouch for the employee's return. Defendant contends that such examination was warranted in the light of the alarming statements made by plaintiff to Fotta. This Court, in that regard, concludes that defendant acted reasonably. In any event, after the examinations, Munday returned to work on March 23, 1992.

On March 23, 1992, Munday was placed on the recycle route. At trial, she testified that drivers still refused to talk to her, the driver who was training her refused to help her sequence her stops,[4] several of her extra stops were not logged, there were rumors spread among other employees that, on the one hand, she was homosexual, and on the other hand, she had sex on the Elkridge

---

**4.** The sequencing of a route involves arranging each stop on the driver's list in an order which allows the driver to service each stop in the most efficient manner.

premises with one or more male employees, and she was unfairly reprimanded over the radio by her immediate supervisor, Jimmy Ponton. Munday contends that male employees were not subjected to such treatment. However, the testimony of witnesses for defendant, largely unrebutted by Munday, is that all of plaintiff's aforementioned complaints were investigated and those which proved to have merit were remedied with reasonable promptness.

Plaintiff was again absent from work from April 10, 1992, until April 23, 1992, with a work-related knee injury. Following her return, Munday testified that she did not receive a promotion into either of two available positions despite the fact that she believes that she was more qualified than those who received the jobs. However, in the light of her many absences, and her lack of reliability, defendant's determination that Munday was not qualified for those positions appears valid. Munday also contends that defendant did not provide her with light duty work on May 6, 1992, and instead sent her home. She argues that other similarly injured employees received light duty positions. However, the testimony of witnesses for defendant reveals that defendant reasonably accommodated Munday with available limited duty work, and eventually had to send her home when no other work of that nature was available. Further, upon being sent home, Munday cursed at her immediate supervisor, Ponton.

Munday returned to work on August 17, 1992, and was placed back on the recycle route, rather than the route she requested. Her preferred route had already been given to another employee.

Munday testified that on the recycle route she had to drive with a driver who scared her by dangerous driving and by threats, that she had to pick up contaminated loads when she drove alone, and that her immediate supervisor ignored her complaints. Again, Munday states that no male employees were subjected to those conditions. The record indicates that each and all of such complaints by Munday were investigated appropriately by one or more supervisory employees, that Munday was informed of the same, and on some occasions indicated she was satisfied with the handling of complaints, and on others that she was not so satisfied.

On September 29, 1992, Munday left work and was placed on disability leave after suffering so-called panic attacks while driving her route. Munday began a new job on October 26, 1992, with East Coast Sweeping, but it was not until December 7, 1992, that she informed defendant that she was resigning from employment by defendant.

During trial two psychologists, Dr. Lawrence Adler and Dr. John Lion were called to the witness stand respectively by plaintiff and defendant. Dr. Adler treated Munday over a period of many months. Dr. Lion saw her only twice after being retained by defendant for purposes of this litigation. One or both of the two doctors related Munday's employment difficulties, her life long tensions with her mother, her mother's death from cancer during Munday's employment with defendant, her divorce at an earlier time, sexual advances made by an aged uncle, a break-up with a long-time boyfriend, and her general dissatisfaction with life. Dr. Adler diagnosed Munday as having experienced a major mood disorder and post-traumatic stress disorder during her employment with defendant, and for at least a few weeks after Munday terminated her employment there. Dr. Adler concluded that those emotional illnesses were principally caused by sex discrimination and sexual harassment on the job. In contrast, Dr. Lion expressed the view that Munday had experienced a temporary period of emotional stress during her period of employment by defendant and that such stress did not arise at any time to the level of major mood disorder or post-traumatic stress disorder. Dr. Lion stated that although the stress which Munday experienced prior to the end of her employment relationship with defendant was caused in part by her perceptions of on-the-job sex discrimination and sexual harassment, Dr. Lion was unable to reach an opinion as to how much of the stress was attributable to the non-job-related problems which Munday had experienced and was experiencing. This Court has great respect for the opinions of both doctors, and notes that Dr. Adler, as the

treating psychiatrist, had much more opportunity to observe Munday and to evaluate her complaints than did Dr. Lion. However, this Court nevertheless is of the view that Munday convinced Dr. Adler that her complaints and perceptions concerning sex discrimination and sexual harassment were correct to a greater degree than this Court finds it possible to accept. In that context, this Court largely adopts Dr. Lion's views.

■ This Court has little question but that Munday was subjected to many inappropriate comments and actions concerning gender while she was employed by defendant. Those occurrences should, of course, not have taken place. But, in the view of this Court, the totality was not "sufficiently severe or pervasive 'to alter the conditions of [Munday's] employment and create an abusive working environment'". *Meritor Savings Bank, FSB v. Vinson*, 477 U.S. 57, 67, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986) (citation omitted). This Court's views in that regard relate to the period prior to Munday's discharge on May 30, 1989, and also to the period commencing with her return to work on July 8, 1991, following the Settlement Agreement of April 19, 1991. During both periods, Munday herself greatly contributed to the difficulties of which she complains by her own abrasive conduct and by her tendency to blame her problems on others and to assume little responsibility for her own errors, as well as by her general dissatisfaction with her life. In addition, the type of employment involved was difficult and demanding, and the entire work atmosphere can only be described as a rather tough one. The testimony of one or more witnesses who are still employees of defendant indicated their reluctance to become involved in the difficulties of Munday and/or other employees and a desire to avoid jeopardizing their own employment positions with a company which apparently experiences considerable job turnover.

It is to be noted, also, that Bohager, as General Manager of the Elkridge, Maryland facility, could easily have rejected Munday's application to return to work at that facility following her dissatisfaction with the job she took after she left the Washington facility.

The entire record does not reveal any general discriminatory pattern on the part of defendant against employment of women, in terms of hiring, status on the job, promotion, or the like. Nor does the entire record support Munday's view of a general pattern of sex harassment. Rather the record discloses a tough, earthy atmosphere in which there were undoubtedly statements and questions which would have grated upon a reasonable woman. But those comments in no way added up to a "pervasive" atmosphere of sex discrimination or sexual harassment.

After Munday's return to work in July, 1991, following the Settlement Agreement, what occurred was not sexual harassment or sex discrimination, but rather, a pattern of conduct orchestrated by Bohager of retaliation against Munday with the purpose in mind of gradually causing Munday herself to reach the conclusion that she could not continue her employment by defendant. While Bohager from time to time assigned supervisors to try to take care of Munday's complaints to the fullest extent possible, Bohager at the same time instructed persons working for him to spy on Munday, to report her activity and comments to him, to watch, in effect, for every slip that she made, and to treat her on an isolated basis. While this Court notes the differences in testimony of certain witnesses in that latter regard, this Court has little doubt but that Bohager did give instructions to isolate Munday as much as possible. A number of Munday's complaints—such as those concerning bathroom facilities and her medical insurance—involved problems which were reasonably handled by the company, although sometimes more slowly than should have been the case. Overall, Bohager was careful not to leave a trail of unfair treatment of Munday in those regards. Rather, he pursued a slower and more careful approach, particularly after his totally unjustified outburst during the July 26, 1991, meeting which he held with Johnson and Munday. In sum, this Court has little or no doubt that Bohager pursued, from the moment of the Settlement Agreement, a program and policy of retaliatory action against Ms. Munday because of her complaint to the Howard County authorities following her

May 30, 1989, discharge and because of his dissatisfaction with the settlement agreement.

## I. SEX DISCRIMINATION AND SEXUAL HARASSMENT

Munday alleges that during her employment with Waste Management she was subjected to sex discrimination and sexual harassment which resulted in a hostile work environment in violation of Title VII. The alleged harassment includes the lack of cleanliness and supplies in the women's bathroom, the lack of attention to her medical benefits and her pay rate upon her return, the dispatcher's failure to log Munday's stops, her supervisor's refusal to help her sequence her stops, and sexual rumors concerning both Munday's sexual preference and alleged affairs between Munday and other employees. The Supreme Court, in *Meritor Savings Bank, FSB v. Vinson,* 477 U.S. 57, 66, 106 S.Ct. 2399, 2405, 91 L.Ed.2d 49 (1986), held that "a plaintiff may establish a violation of Title VII by proving that discrimination based on sex has created a hostile or abusive work environment." *See also Katz v. Dole,* 709 F.2d 251 (4th Cir.1983). "For sexual harassment to be actionable, it must be sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive work environment.'" *Meritor,* at 67, 106 S.Ct. at 2405 (quoting *Henson v. Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). In *Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993), the Supreme Court elaborated upon the standard of a hostile environment, stating that:

> [W]hether an environment is 'hostile' or 'abusive' can be determined only by looking at all the circumstances. These may include the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating; or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance.

*Id.* at ——, 114 S.Ct. at 369, 126 L.Ed.2d at 302.

█ To establish a prima facie showing of sexual harassment, a plaintiff must show "that the conduct in question was unwelcome, that the harassment was based on sex, and that the harassment was sufficiently severe or pervasive to create an abusive working environment" and that there is "some basis for imposing liability on the employer." *Swentek v. USAir, Inc.,* 830 F.2d 552, 557 (4th Cir.1987) (citing *Henson,* 682 F.2d at 903–04). Defendant may rebut the prima facie showing "'directly, by proving that the events did not take place, or indirectly, by showing that they were isolated or genuinely trivial.'" *Raley v. Board of St. Mary's County Comm'rs,* 752 F.Supp. 1272, 1279 (D.Md.1990) (quoting *Katz,* 709 F.2d at 256). If the plaintiff shows that the employer knew of the harassment and failed to act, the defendant may rebut that showing by demonstrating "the taking of 'prompt remedial action reasonably calculated to end the harassment.'" *Id.*

█ Munday has failed to establish by a preponderance of the evidence the prima facie elements of sexual harassment. The actions she complains of, such as a delay in getting benefits or the lack of bathroom supplies, are the sorts of aggravating circumstances which occur in many workplace environments and simply do not constitute an all pervasive, abusive working environment. Further, when Munday complained about those mix-ups to her immediate supervisors, they remedied or sought to remedy her complaints, and often, Munday expressed satisfaction with the way in which those problems were handled. The fact that Munday got caught up in the defendant's red tape on more than one occasion does not satisfy the requirement that the harassment was based upon sex.

Munday also complains that she was treated differently than male drivers because she did not get help sequencing her route, her logs were not correctly handled, she had to pick up contaminated loads, and she was reprimanded over the radio. However, the testimony of defendant's witnesses at trial shows that either those events did not occur, or that male drivers suffered the same perceived indignities as plaintiff. Moreover, the testimony at trial also revealed that Munday was a difficult and demanding employee who complained to her superiors at the slightest

provocation of what she regarded to be sex discrimination or sexual harassment. As a result of her workplace demeanor, she appears to have herself initiated many of the perceived—and sometimes real—problems which she claims she suffered. The evidence does not show that Munday was treated differently because of her *sex*; rather, to the degree she suffered unwelcome behavior, it appears that one or more of her supervisors, particularly Bohager, was motivated by personal dislike of Munday.

■ Munday also asserts that rumors regarding her sexual activity continued to spread until her eventual resignation from employment with defendant. Munday, in at least a number of those instances, did not identify who was spreading those rumors or how she heard of them. In any event, those alleged rumors do not rise to the requisite level of pervasiveness. "Mere utterance of an epithet which engenders offensive feelings in a female employee would not affect the conditions of employment to a sufficiently significant degree to violate Title VII." *Pagana–Fay v. Washington Suburban Sanitary Comm'n*, 797 F.Supp. 462, 468 (D.Md. 1992) (citing *Vinson*, 477 U.S. at 67). Accordingly, this Court concludes that Munday has not established a prima facie claim of sex discrimination or sexual harassment.

## II. RETALIATION

Munday alleges that defendant retaliated against her in response to her filing of sex discrimination charges with the Howard County Office of Human of Rights and the resulting settlement agreement dated April 19, 1991. Under Title VII, 42 U.S.C. § 2000e–3(a), it is "an unlawful employment practice for an employer to discriminate against any of his employees ... because he has opposed any practice made an unlawful employment practice by this subchapter, or because he has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under this subchapter."

■ To fulfill the prima facie requirements of a retaliation claim, a plaintiff must demonstrate three elements: "1) the employee engaged in protected activity; 2) the employer took adverse employment action against the employee; and 3) a causal connection existed between the protected activity and the adverse action." *Ross v. Communications Satellite Corp.*, 759 F.2d 355, 365 (4th Cir.1985). Defendant does not dispute that Munday satisfies the first prong of the prima facie test. Munday, by filing a sex discrimination complaint with the Howard County Office of Human Rights, clearly engaged in activity protected under Title VII.

■ With regard to the second element, this Court finds that Bohager took adverse employment actions against Munday, which include yelling at her during the July 26, 1991, meeting, directing other employees to ignore her and to spy on her, and generally refusing himself to communicate with her concerning her employment-related complaints, even though some of them were not meritorious. Upon Munday's return to Waste Management in July 1991, Bohager set in motion a pattern of retaliation, exemplified primarily by his refusals on at least certain occasions to deal directly with Munday and his not-so-subtle suggestion that other employees should do the same. In effect, Bohager had knowledge of a number of Munday's employment related and non-employment related problems and failed to act appropriately in a number of instances in the expectation that those problems would eventually wear down Munday and force her to quit. His retaliatory plan eventually worked; his adverse employment actions against Munday continued into September 1992, at which time she ceased working for defendant.

As to the third prima facie element, defendant asserts that plaintiff has not demonstrated a causal connection between her filing of an employment discrimination charge and Bohager's adverse actions against her. However, several factors indicate to the contrary. To begin with, upon Munday's return in July 1991, her paperwork was largely incomplete, no uniform had been ordered for her, and her pay rate had not been adjusted in accord with the settlement agreement. Defendants' lack of preparation upon Munday's return displays a lack of concern by

defendant with abiding by the terms of the settlement agreement. The testimony of witnesses for defendant shows at most that various high-level persons at Waste Management passed off to other employees responsibility for Munday's return, and that, in fact, those in charge did not check to confirm whether such preparation had or had not been made. Additionally, at the July 26, 1991, "meeting" between Bohager, Johnson, and Munday, Bohager yelled at Munday concerning rumors to the effect that Munday would be suing the defendant again. The content of Bohager's attack on Munday, combined with his tone of voice at that meeting, links his anger over the settlement agreement with his retaliatory actions against Munday. Finally, Bohager's instructions to other employees not to have normal relations with Munday and to report back to him all of her actions, further indicates his intention to retaliate against Munday for lodging her complaint with the Howard County authorities and for achieving the April 19, 1991, settlement. Accordingly, Munday has satisfied her burden of establishing a prima facie case of retaliation.

■ Under the burden shifting scheme of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973), applicable in retaliation cases, defendant may rebut a prima facie case of retaliation by demonstrating "a legitimate nondiscriminatory reason for the adverse action." *Ross*, 759 F.2d at 365. However, defendant has not sufficiently done so in this case. Although Munday was hardly a model employee, her behavior at Waste Management in no way called for Bohager to yell at her on July 26, 1991, or to direct other employees to ignore her and to spy upon her. Thus, this Court concludes that Munday has established by a preponderance of the evidence that the "adverse action would not have occurred 'but for' the protected conduct," *i.e.*, her filing of charges with the Howard County Office of Human Rights which resulted in the settlement agreement of April 19, 1991. *Ross*, 759 F.2d at 366. Accordingly, the third *Ross* element has been satisfied by plaintiff.

## III. CONSTRUCTIVE DISCHARGE

■ Munday contends that defendant's sex discrimination, sexual harassment, and retaliatory conduct resulted in her constructive discharge. Because this Court has concluded that neither sex discrimination nor sexual harassment occurred in this case, this Court will consider her constructive discharge claim only with regard to the retaliatory pattern of conduct by defendant. "A constructive discharge occurs when 'an employer deliberately makes an employee's working conditions intolerable and thereby forces him to quit his job.'" *Bristow v. Daily Press, Inc.*, 770 F.2d 1251, 1255 (4th Cir.1985) (citations omitted), *cert. denied*, 475 U.S. 1082, 106 S.Ct. 1461, 89 L.Ed.2d 718 (1986). "A plaintiff alleging constructive discharge must therefore prove two elements: deliberateness of the employer's action, and intolerability of the working conditions." *Id.*

■ Munday has proved by a preponderance of the evidence that defendant acted deliberately, *i.e.*, defendant had the "specific intent to force [her] to leave." *Id.* (citing *J.P. Stevens & Co., Inc. v. NLRB*, 461 F.2d 490, 494 (4th Cir.1972)). Bohager's retaliatory actions, described *supra*, were provoked by his displeasure with Waste Management's decision to settle with Munday and his personal dislike of Munday. Moreover, his inactions in the light of full knowledge of Munday's troubles, both within and outside of the workplace, further indicate his intent to force her to quit.

As to the intolerability of the working conditions, plaintiff must show that a "'reasonable person' in the employee's position would have felt compelled to resign." *Id.* (citations omitted). "[T]he law does not permit an employee's subjective perceptions to govern a claim of constructive discharge." *Id.* After considering all of the evidence in this case, this Court concludes that a reasonable person in Munday's position would have felt compelled to quit as a result of Bohager's outward antagonism and retaliatory conduct, even though Munday mistakenly, in this Court's opinion, wrongly viewed such antagonism and retaliatory conduct as based on sex discrimination and sexual harassment. Although a considerable amount of time passed

between the July 26, 1991, "meeting" and Munday's resignation, Bohager continued to urge other employees not to have contact with her and to spy on her. Thus, throughout her tenure at Waste Management, she had to cope with being ignored both by her co-workers and by the top supervisor at the Elkridge facility. Under those circumstances, the atmosphere of the workplace was rendered objectively intolerable in so far as Munday was concerned. Accordingly, this Court concludes that Munday was constructively discharged from Waste Management.

## IV. BREACH OF CONTRACT

■ Munday maintains that defendant breached three provisions of the April 19, 1991 settlement agreement. First, she asserts that defendant breached ¶ 3A of the agreement, which provided that "a written letter of reinstatement from [Waste Management] at the time of her return to work ... will be placed in her file." She states, and the record in this case no way indicates to the contrary, and therefore this Court has no reason to doubt, that she did not receive a letter to that effect until September of 1991, two months after she returned from work. However, she concedes that any damages arising out of that breach are nominal at most.

Second, Munday contends that defendant failed to provide her with an adequate restroom and changing area in compliance with ¶ 3(g). However, the testimony of Mr. Coggins, the Howard County Investigator, reveals that within a reasonable time period after Munday's July 1991 return to work, the bathroom facilities were adequate. On the whole, Munday's complaints concerning the bathroom were eventually reasonably addressed.

Finally, Munday claims that defendant violated ¶ 4 of the agreement which provides that the defendant "agrees that there shall be no discrimination or retaliation of any kind against any person because of lawful opposition to any practice declared unlawful

under ... Title VII, or because of the filing of a charge, giving of testimony or assistance, or participation in any manner in any investigation, proceeding or hearing under ... Title VII." As this Court has concluded in Part II, *supra*, defendant retaliated against plaintiff in response to her filing of a charge of discrimination with the Howard County Office of Human Rights and the ensuing settlement. Accordingly, defendant breached its contractual duties as set forth in ¶ 4 of the April 19, 1994, settlement agreement.

## V. DAMAGES

Plaintiff is entitled to the award of damages for retaliation and for constructive discharge, in violation of Title VII, and for defendant's breach of contract. The breach of contract, *i.e.*, breach of the Settlement Agreement of April 19, 1991, consists of the retaliatory conduct by defendant.

### Title VII

■ Prior to November 21, 1991, the effective date of the Civil Rights Act of 1991, a Title VII plaintiff could only obtain equitable remedies, such as back pay and reinstatement. *See Landgraf v. USI Film Products,* — U.S. ——, ——, 114 S.Ct. 1483, 1491, 128 L.Ed.2d 229, 245 (1994). Thus, prior to November 21, 1991, plaintiff could not receive compensatory damages, as such, as for example, for emotional or psychological distress, or any punitive damages. With regard to the post-November 21, 1991, period, however, plaintiff is entitled to obtain not only appropriate equitable relief, but also compensatory damages for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses." 42 U.S.C. § 1981a(b)(3). Furthermore, under the Civil Rights Act of 1991, plaintiffs may recover punitive damages if she can show that defendant acted "with malice or with reckless indifference to the federally protected rights" of plaintiff. 42 U.S.C. § 1981a(b)(1).[5]

---

5. In *Landgraf,* the Supreme Court held that the Civil Rights Act did not apply retroactively to cases pending on November 21, 1991, the effective date of the Act. *Landgraf* was a case pending on November 21, 1991, involving discriminatory actions all of which occurred prior to that date. In contrast, the within case pertains to conduct which occurred both before and after

■ With regard to equitable relief, counsel for the parties have agreed that plaintiff started her new job with East Coast Sweeping on October 26, 1992, and that she has received payment from defendant of all pay that she is entitled to receive up to and including that date. Accordingly, Munday is entitled to receive the pay which she would have received from October 26, 1992, to and including the date of judgment in this case, namely, July 26, 1994.[6] In that regard, counsel for the parties have agreed that that amount is $17,183.47, and that it includes the difference between what plaintiff would have earned from October 26, 1992, to July 26, 1994, if she had worked for defendant during that period instead of East Coast Sweeping. It is to be noted that the parties have agreed that plaintiff was paid less during that period by her new employer than she would have been expected to have earned if she had worked during that period for defendant.

■ Plaintiff has not sought reinstatement of her job with Waste Management, and defendant agrees with her that such equitable relief would be inappropriate. Plaintiff instead seeks front pay which "is considered the equitable equivalent of reinstatement" and is awarded "when the remedy of reinstatement is simply not appropriate, usually because of the hostility that has developed between the parties." *Larson* § 55.39, at 11–96.121. Plaintiff originally asserted that she was entitled to "front pay"

from the date of judgment in this case through her work life expectancy on a present discounted value basis. However, after considering the existing case law and treatise authority, plaintiff has reduced her request for front pay to a period of four years from the date of judgment, a request defendant wholly opposes. In the view of this Court, this is not a case in which the award of any front pay is appropriate. Front pay should be utilized as a remedy only when reinstatement is not possible, and also should not be awarded, unless, in the discretion of the Court, it produces an appropriately equitable result. In this case, in the opinion of this Court, if Munday had returned to work in July, 1991, after the April, 1991, Settlement Agreement, and if the defendant, under the guidelines and direction of Bohager, had not engaged in a pattern of retaliatory conduct against plaintiff, Munday's own inabilities to get along with other people would, in the workplace atmosphere of the Elkridge facility, have resulted in her not being able to stay with such employment for long.

Munday returned to work July 8, 1991. She was off work because of physical and other disabilities from August 1, 1991, to March 11, 1992. She worked from March 23, 1992, and was off work again from April 10, 1992, to April 23, 1992. She then was off work from May 6, 1992, to sometime in August, 1992, because defendant had no light duty work for plaintiff to perform in her

November 21, 1991. Moreover, the within case was not pending on November 21, 1991, but was filed after that date. Throughout his opinion in *Landgraf*, Justice Stevens disapproved of retroactively applying new laws "to conduct that occurred at an earlier date," —— U.S. at ——, 114 S.Ct. at 1493, 128 L.Ed.2d at 247, and strongly affirmed the "traditional presumption against applying statutes affecting substantive rights, liabilities, or duties to conduct arising before their enactment." *Id.* at ——, 114 S.Ct. at 1504, 128 L.Ed.2d at 260. Justice Stevens stressed that persons should be governed by the law in effect at the time at which they act. *Id.* at ——, 114 S.Ct. at 1507, 128 L.Ed.2d at 264. Accordingly, this Court concludes that the Civil Rights Act of 1991 does not entitle plaintiff to any damages, compensatory or punitive, for any of defendant's conduct which occurred prior to November 21, 1991, and for which damages were not available under the provisions of Title VII in force and effect prior to and up to that date.

6. The general rule is that the back pay period ends on the date of the court order authorizing back pay and determining other appropriate relief, although the courts have used a variety of other dates or events to terminate the back pay period. In some older cases, the date of filing the complaint or the date of trial were sometimes used. Measuring the period by these dates, though, is less consistent with the 'make whole' purposes of Title VII. 2 *Arthur Larson and Lex K. Larson, Employment Discrimination* § 55.37(a)(2), at 11–96.43 to 11.-96–45 (1994) (footnotes omitted).

This Court and counsel had contemplated that this opinion would be filed on July 26, 1994, but certain delays occurred before the parties agreed upon the said back pay figure. While for all other purposes, including calculation of appeal time under Fed.R.App.P. 4(a), the date of filing is the judgment date, the date of July 26, 1994, is referred to in this opinion as the judgment date with respect to the end of the back pay period.

disabled condition. She then returned to work until September 29, 1992, her last day with defendant, and started her new job on October 26, 1992.[7]

■ Munday will receive an award of back pay through the date of judgment in this case. That results in her being paid as if she had worked up to July 26, 1994. Thus, she will be paid not only for all periods of disability or unavailability of appropriate work during the Spring and Summer of 1992, but also as if she had worked for defendant to and including October 26, 1992. That means she will receive pay for about a year and three-quarters, after October 26, 1991, which provided to her more than ample time to regroup within the employment market and to become established in her new employment following her leaving the employ of defendant. The relevant cases teach us that Munday is entitled to receive no more than that, namely, pay on an equitable basis while she in effect "regroups." Therefore, this Court concludes that plaintiff should not be awarded any pay following the date of judgment in this case, namely July 26, 1994. *See generally, McKnight v. General Motors Corp.*, 973 F.2d 1366, 1369–1372 (7th Cir. 1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1270, 122 L.Ed.2d 665 (1993); *Patterson v. American Tobacco Co.*, 535 F.2d 257, 269–70 (4th Cir.1976), *cert. denied,* 429 U.S. 920, 97 S.Ct. 314, 50 L.Ed.2d 286 (1976).[8]

■ As discussed *supra*, plaintiff is entitled to receive compensatory damages for psychological harm resulting from defendant's conduct in violation of Title VII which conduct occurred after November 21, 1991. If the federal statutory changes which became effective on November 21, 1991, had been in effect during the *entire* period affected by defendant's retaliatory conduct, that is, from July 8, 1991, to and including July 26, 1994, this Court would award plaintiff $50,000. Breaking down that award into the pre and post-November 21, 1991, parts of that period, this Court allocates $30,000 for the period from July 8, 1991, to November 21, 1991, and $20,000 for the period from November 21, 1991, to July 26, 1994. While the pre-November 21, 1991, period is considerably shorter in time than the post-November 21, 1991, period, it was during the former period that the most egregious acts of discrimination orchestrated by Bohager took place and that plaintiff suffered the greatest psychological harm. During the post-November 21, 1991, period, Bohager simply allowed matters to drift, resulting in conditions which made it intolerable for Munday to continue her employment by defendant.

■ In setting the amount of psychological and/or emotional damages at $50,000, this Court concludes that that is a fair amount to award to a person who was subject to retaliatory conduct of a nature which no reasonable employee should be expected to put up with

---

7. Bohager's last day with the company before he left was November 17, 1992. The reason for Bohager leaving the company would not appear very relevant or material with regard to the issues before this Court for decision in this case. Bohager's testimony indicated that he left to take care of family affairs and not for any other reason. Plaintiff questions whether there were not other reasons for his departure, including friction between Bohager and other management officials of the defendant company.

8. *See also Bailey v. Container Corporation of America*, 660 F.Supp. 1048, 1053–54 (S.D.Ohio 1986); *Goss v. Exxon Office Sys. Co.*, No. 82–3156, 1983 WL 612, at *9–10 (E.D.Pa. July 1, 1983); *Griffin v. George B. Buck Consulting Actuaries, Inc.*, 566 F.Supp. 881, 882 (S.D.N.Y.1983); *Larson* § 55.39, at 11–96.125.

Commenting in *Goss* with regard to "front pay" Judge Newcomer stated: "I believe it would require excessive speculation to make such an award [for front pay].... Compensation in the sales business depends on a number of factors other than the individual salesperson's ability.... There is no evidence from which I can make a reasonable projection...." *Id.* at *10. While plaintiff's work with defendant is not related to sales, it would, in the view of this Court, also be quite speculative for this Court to try to determine what plaintiff will earn after July 26, 1994. In that regard, there is evidence in the record that plaintiff's compensation while working for defendant was higher than it would have been if she had worked before that date for her current employer because of overtime work at overtime pay rates. Whether that fully explains the lesser amount of earnings by plaintiff in her present job as compared her earnings from defendant is not entirely clear. But that is an example of one of many factors which pertain to the speculative nature of predicting what plaintiff will earn after July 26, 1994.

and which indeed, on a subjective basis, Munday found it not possible to accept. The $50,000 amount would not, in this Court's opinion, be sufficient if this Court accepted Dr. Adler's opinions concerning major mood disorder and/or post traumatic stress disorder. However, the $50,000 is, in this Court's view, a fair award for the type of emotional upset consistent with Dr. Lion's views.[9] In that regard, this Court notes that if it were convinced, as Dr. Adler is, that Munday was subjected to pervasive sex discrimination and sexual harassment while on the job, this Court would have different views concerning the amount of damage suffered by Munday.[10] But this Court, as related *supra*, does not believe that the conduct of defendant rose to the level indicated by Dr. Adler.

▮ That leaves for determination the question of punitive damages. As noted *supra*, punitive damages are not available under the federal statute for conduct which occurred prior to November 21, 1991. However, they are so available for conduct after that date. In this Court's view, the lack of evidence in the record indicating any change in the pattern of retaliatory conduct after Munday returned to work on July 8, 1991, and before she took her new job on October 26, 1992, requires the finding that such retaliatory conduct continued throughout that period. In that context, this Court is of the view that punitive damages should be award-ed with regard to the post-November 21, 1991, period, in the amount of $40,000, representing 40% of what this Court believes is an appropriate punitive damage amount for the entire period from July 8, 1991, to October 26, 1992, namely $100,000.[11]

### Breach of Contract

▮ As discussed *supra*, compensatory damages for emotional stress and punitive damages resulting from defendant's pre-November 21, 1991, conduct are not available to plaintiff *under Title VII*. The question, however, arises as to whether such damages for that period are available *under Maryland law* for breach of defendant's duty not to retaliate. In Maryland, compensatory damages for "emotional disturbance" resulting from breach of contract are recoverable only if "the breach also caused bodily harm or the contract or the breach is of such a kind that serious emotional disturbance was a particularly likely result." Restatement (Second) of Contracts § 353.[12] In this Court's view, defendant's conduct in this case meets that test, particularly since Bohager and other supervisory employees of defendant were aware of plaintiff's many emotional problems. As to punitive damages, they may not be recovered under Maryland law for breach of contract in and of itself unless such breach of contract is "for a tort related to a contract claim" *and* is accompanied by " 'proof of actual malice.' "

---

9. In order to establish liability for conduct involving sexual harassment, all that is needed in that "the environment would reasonably be perceived, and is perceived, as hostile or abusive ..., there is no need for it also to be psychologically injurious." *Harris*, —— U.S. at ——, 114 S.Ct. at 371, 126 L.Ed.2d at 302. But if it is "psychologically injurious" that, of course, provides a basis for increased damages. Herein, plaintiff's psychological stress, to the extent Dr. Lion opined that the same occurred, is taken into account by this Court in arriving at the $50,000 figure.

10. Under the provisions of the federal legislation which became effective on November 22, 1991, there is a cap placed upon compensatory damages depending upon the number of employees employed by defendant. In this case, those cap provisions are above the amount of compensatory damages awarded by this Court in accordance with this opinion; accordingly, the cap provisions do not have any effect in this case. 42 U.S.C. § 1981a(b)(3).

11. In that regard, this Court is utilizing the same 40% approach with regard to punitive damages as it has, *supra*, in connection with compensatory damages.

12. *See also Jih v. Long & Foster Real Estate, Inc.*, 800 F.Supp. 312, 320 (D.Md.1992). By inadvertent error, the citation at page 320 in that case is to § 31 of the Restatement (Second) of Contracts rather than to § 353. Also, at page 320, there is an indication that damages for such psychological harm are not available in a contract action under Maryland law "unless the breach was wanton or reckless *and* caused bodily harm and the defendant had reason to know at the time the contract was made that breach would cause mental suffering for reasons other than mere pecuniary loss." (Emphasis added). Pursuant to § 353, it is clear that the above-quoted word "and" should have been "or."

*Sibley v. Lutheran Hospital of Maryland, Inc.,* 709 F.Supp. 657, 662 n. 7 (D.Md.1989) (citations omitted), *aff'd,* 871 F.2d 479 (4th Cir.1989); *see also Owens–Illinois v. Zenobia,* 325 Md. 420, 460 n. 21, 601 A.2d 633 (1992). In the within case, this Court has little question but that the actions of Bohager and other supervisory employees were motivated by "actual malice," particularly in the light of Bohager's dislike of Munday. Also, defendant's breach of contract by way of retaliatory action would appear to be a "tort related to a contract claim," *Sibley,* 709 F.Supp. at 662 n. 7, even though the type of tort involved is not a common law tort, but a federal statutory tort, *i.e.,* a violation of Title VII.

▮▮▮▮ Thus, compensatory damages for psychological harm and also punitive damages are available to plaintiff with regard to defendant's breach of its contractual undertaking not to retaliate, as set forth in the April 19, 1991, settlement agreement, not only with regard to the post-November 21, 1991, period, but also the pre-November 21, 1991, period, if Maryland law governs. The question arises, however, as to whether Maryland or federal legal principles apply with respect to the pre-November 21, 1991, period. "A negotiated settlement agreement is a contract, and a private party to such a contract may sue to enforce it like any other contract." *Larson* § 48.24, at 9A–119. "Although Title VII settlement agreements are contracts, they are inextricably linked to Title VII. Federal common law governs the enforcement and interpretation of such agreements because the 'rights of the litigants and the operative legal policies derive

from a federal source.'" *Snider v. Circle K Corp.,* 923 F.2d 1404, 1407 (10th Cir.1991) (quoting *Fulgence v. J. Ray McDermott & Co.,* 662 F.2d 1207, 1209 (5th Cir.1981)). In *Snider,* plaintiff and her employer entered into a settlement agreement after plaintiff had filed a Title VII charge with the Oklahoma Human Rights Commission and the EEOC. That agreement included the undertaking by the employer "[t]o not discriminate or take any adverse action against Ms. Snider ... because she filed the above-referenced charge." *Id.* at 1406. Plaintiff later brought suit against her employer alleging, *inter alia,* post-settlement violations of Title VII and breach of contract. In the course of determining that a jury trial was not available to the plaintiff in connection with the breach of contract claim, Judge Logan, writing for the Tenth Circuit, stated that "[t]he linkage between Title VII settlement agreements and Title VII is particularly evident in the instant case.... [U]nder ... [the] settlement agreement, [defendant] promises little more than to refrain from violating Title VII in the future." *Id.* at 1408. Under the principles set forth in *Snider* and the authorities referred to therein,[13] plaintiff may not receive damages unavailable under Title VII pursuant to her common law claim. Congress and the Supreme Court have determined that compensatory and punitive damages simply are not available for discriminatory conduct which occurred prior to November 21, 1991.[14]

▮▮▮▮ Plaintiff, however, argues that 42 U.S.C. § 2000e–7 requires a different result with regard to damages resulting from de-

**13.** *See Perdue v. Roy Stone Transfer Corp.,* 690 F.2d 1091, 1095 n. 8 (4th Cir.1982) (referred to in *Snider,* 923 F.2d at 1407 n. 1).

**14.** In *O'Melveny & Myers v. FDIC,* —— U.S. ——, 114 S.Ct. 2048, 129 L.Ed.2d 67 (1994), Justice Scalia clearly indicated preference for utilizing state common law principles rather than fashioning federal common law principles in determining the tort liability of attorneys who provided services to a bank of which the FDIC was a receiver. Justice Scalia concluded in *O'Melveny* that "this is not one of those extraordinary cases in which the judicial creation of a federal rule of decision is warranted." Slip op. at 10, —— U.S. at ——, 114 S.Ct. at 2055. Although Justice Scalia stated that federal common law should

only be created in certain, narrow situations, he noted that "[i]n answering the central question of displacement of California law, we of course would not contradict an explicit statutory provision." Slip op., at 6, —— U.S. at ——, 114 S.Ct. at 2054. In the within case, this Court is confronted with a comprehensive federal *statutory* scheme which explicitly provides for certain damages. To permit plaintiff to use Maryland law to make an end-run around that congressional determination would undermine the several specific comments by Justice Stevens in his opinion in *Landgraf,* that damages are *not* available for conduct which occurred prior to November 21, 1991.

fendant's pre-November 21, 1991, breach of contract by way of retaliatory conduct. That section provides:

> Nothing in this subchapter shall be deemed to exempt or relieve any person from any liability, duty, penalty, or punishment provided by any present or future law of any State or political subdivision of a State, other than any such law which purports to require or permit the doing of any act which would be an unlawful employment practice under this subchapter.

Thus, state laws which provide additional rights and remedies for employment discrimination are not preempted as such by Title VII. " 'The clear inference is that Title VII was designed to supplement, rather than to supplant, existing laws and institutions relating to employment discrimination.' " *Frazier v. Colonial Williamsburg Foundation*, 574 F.Supp. 318, 321 (E.D.Va.1983) (quoting *Alexander v. Gardner–Denver Co.*, 415 U.S. 36, 48, 94 S.Ct. 1011, 1019, 39 L.Ed.2d 147 (1974)). In *Frazier*, the Court concluded that Title VII did not preempt the plaintiff's state contract claim of violation of an employment agreement by the firing of the plaintiff by his employer without just cause. Judge MacKenzie in *Frazier* noted that "Virginia's common law rule seeks a result consistent with the objections [sic] of Title VII." *Id.* at 321. However, in the within case, the breach of contract claim *is* itself the breach of Title VII—it does not involve a state's determination that it will independently exercise its " 'regulatory power over discriminatory employment practices.' " *Id.* (quoting *New York Gaslight Club, Inc. v. Carey*, 447 U.S. 54, 67, 100 S.Ct. 2024, 2032, 64 L.Ed.2d 723 (1980)). Rather, it involves, as did *Snider*, enforcement by Munday of her right under federal law not to have been subjected to retaliation for exercising her Title VII statutory rights. Therefore, plaintiff herein should not be permitted to obtain damages under state law which are unavailable under the very federal law which itself provides *the* right which plaintiff is enforcing. As the Court explained in *Shehadeh v. Chesapeake & Potomac Telephone Co.*, 595 F.2d 711, 723 n. 60 (D.C.Cir.1978),

> The Act envisions coexistence of state and federal remedies when the two are compat-

ible. See Title VII, § 708, 42 U.S.C. § 2000e–7 (1976). And when state efforts to combat employment discrimination have focused to the extent of express prohibition of invidious practices and designation of a 'State or local authority to grant or seek relief from such practice[s] or to institute criminal proceedings with respect thereto,' Title VII, § 706(c), 42 U.S.C. § 2000e–5(c) (1976), deferral to that authority is specifically authorized. See *id.* On the other hand, *a state's generalized concern for prevention of torts and its provision of judicial remedies simply to that end warrants neither preliminary deferral nor displacement of Title VII coverage.*

(Emphasis added) (citations omitted). In this case, the damages which plaintiff suffered as a result of defendant's Title VII violation *and* breach of contract are identical. Therefore, plaintiff is limited to Title VII remedies.

## VI. CONCLUSION

For the reasons stated in this opinion, judgment will be entered for plaintiff against defendant in the total amount of $77,183.47, that is, $17,183.47 for back pay, $20,000 in compensatory damages for psychological harm, and $40,000 in punitive damages.