77913, 77914. COLEMAN v. HOUSING AUTHORITY OF AMERICUS et al.; and vice versa.
77915. ROBINSON v. COLEMAN.
(381 SE2d 303)

BEASLEY, Judge.
This main appeal and the two cross-appeals arise from an action brought by Lodenia Coleman alleging on-the-job sexual harassment. Coleman was employed by the Housing Authority of the City of Americus, first from 1972 until 1978 as a clerk-typist and subsequently from 1981 to 1987. In 1984 she became an occupancy supervisor. Defendant James Robinson was the Executive Director of the Housing Authority, hired in March 1984. As director he was Coleman's superior and supervisor. The other two defendants are the Housing Authority and Arthur Cheokas, Chairman of its Board of Commissioners.

In 1987 Coleman filed a letter with the Board complaining that Robinson mishandled personnel management functions and engaged in sexual harassment. During the course of an ongoing investigation

and on the day Robinson was to appear before the Board, he resigned as of March 31, 1987. Shortly thereafter, on May 13, Coleman also resigned because of the prolonged effect of the trauma she suffered and because when she tried to talk with Cheokas about the prior problems he "embarrassed me by laughing in my face."

This lawsuit followed. It alleged that Robinson sexually harassed Coleman over the course of three years, that his conduct amounted to the intentional infliction of mental, physical, and emotional distress, and that the defendants Cheokas and Housing Authority negligently hired Robinson and negligently retained him after they knew or should have known of his propensities.

After discovery, defendants moved for summary judgment. The trial court granted the motion as to defendants Cheokas and the Housing Authority on Coleman's allegations of negligent hiring. This is the subject of the main appeal 77913. The trial court denied Cheokas and the Housing Authority's motion on the theory of negligent retention from which they cross-appeal (77914). The trial court also denied Robinson's motion on the basis that there remained genuine issues of fact concerning whether he intentionally inflicted harm on Coleman through the use of language, citing *Tuggle v. Wilson*, 248 Ga. 335 (282 SE2d 110) (1981).

1. The first issue is whether there is sufficient evidence to support an action for intentional infliction of emotional distress by Robinson upon Coleman (cross-appeal 77915). If not, then the causes of action against the other defendants, which are essentially derivative, must fall.

Title VII of the Civil Rights Act of 1964 is not implicated and our analysis proceeds along traditional common law lines. *Favors v. Alco Mfg. Co.*, 186 Ga. App. 480, 482 (1) (367 SE2d 328) (1988). Compare the Title VII case of *Meritor Savings Bank v. Vinson*, 477 U. S. 57 (106 SC 2399, 91 LE2d 49) (1986), where for the purpose of that Act the Court analyzes instances of workplace sexual harassment as constituting two basic types: conditioning favorable treatment upon the granting of sexual favors, and creating a hostile work environment. In that context, the activity here would involve the second category. See 45 AmJur2d 725, Job Discrimination, § 801.

Of course, the common-law principles in Georgia to which we refer are not narrowly limited to the common law and statutes of England as they existed prior to May 14, 1776. See *Hannah v. State*, 212 Ga. 313, 322 (92 SE2d 89) (1956). They include the progression of law that has developed by construction of the statutes and legal maxims since that time. See *Davis v. Atlanta Gas Light Co.*, 82 Ga. App. 460, 463 (61 SE2d 510) (1950). See particularly *Moses v. Prudential Ins. Co.*, 187 Ga. App. 222, 224 (369 SE2d 541) (1988). The common law is a living, growing body, cautiously flexible enough to meet new condi-

tions but firmly tied to the precepts of the past. See 15A AmJur2d 594-599, Common Law, § 1-3, and cases cited.

Thus the Georgia Supreme Court, in *Tuggle v. Wilson*, supra at 337, recognized that already in Georgia a plaintiff could recover in tort "where the defendant has wilfully and wantonly caused emotional upset to the plaintiff through the use of abusive or obscene language." See also the cases and principles for which they are cited in *Moses*, supra.

Ms. Coleman, it is noted, presented evidence of physical manifestations (headaches, crying, chest pains) as well as mental and emotional symptoms (upset, despondency, depression). She also testified that in addition to language, Robinson used other means of communication such as stares, laughter, and the showing of written and pictorial material to cause distress. The type of wilful and wanton injury-causing behavior which she claims was a breach of duty is sexual harassment. What is more, she alleges it was intentional.

Even applying the stringent test enunciated in the holding in *Moses*, Coleman's evidence is not deficient as a matter of law.

In deposition, Coleman testified that although she was promoted shortly after Robinson became her superior, he began at the same time a pattern of sexual communication with her that lasted during most of the time he worked there. She freely conceded that he never touched or made physical contact with her. However, she related a number of examples which she contended amounted to sexual harassment through conversation, innuendo and body language.

According to her, Robinson would call her into his office on business and then inexplicably veer off into personal matters involving sex. He showed her cartoons of a sexual nature, inquired of her as to how she and her husband had sex and if they had tried an act depicted in one of the cartoons. He often sought to engage her in conversation about masturbation and the sexual practices of black women. He proffered her a video about black women engaging in sex together and offered to exchange movies having pornographic content. He told her sexual and racist jokes. The compliments he paid her were of a sexual nature. Once he told her the way she wore a dress "made him crawl all over," and on other occasions he inquired if she knew what her walk did to him. He gave her "funny looks" and often seemed to stare "straight through" her, "looking up and down and just smiling evil." He also spread rumors that she, a married woman, had a "crush" on a co-worker. When they were to have a business conference at a motel, he remarked to her that "you can meet me there a little bit earlier if you want to," with what Mrs. Coleman believed to be an implication of an assignation. He discussed the sexual practices of the former director.

Throughout, she constantly remonstrated with him to stop, pro-

tested, left his office and told him to leave her desk. She talked of bringing these matters to the attention of others, but Robinson warned her of the consequences if she accused him of something she could not prove. Some practices stopped, but only temporarily, after she was particularly vehement in rebuffing him.

During this time, in 1985 and 1987, she was hospitalized for pain in her back and neck and recurring headaches. She also endured spells of crying and depression. Her doctor testified that, in retrospect and at that time, he believed that job-related tension or stress was primarily the cause of her headaches and certainly could have been a factor in all the medical problems she suffered.

Standing alone, some of the incidents she related would not amount to actionable infliction of emotional distress by way of sexual harassment. But the repetition, over her protests, could be found to have had a cumulative effect. This can be particularly acute in an employment setting. The court has recognized that "the existence of a special relationship in which one person has control over another, as in the employer-employee relationship, may produce a character of outrageousness that otherwise might not exist." *Bridges v. Winn-Dixie Atlanta*, 176 Ga. App. 227, 230 (1) (335 SE2d 445) (1985). See also *Tuggle*, supra at 337. The argument that such remarks were insignificant and not sufficient to cause harm belittle but do not defeat the claim.

The workplace is not a free zone in which the duty not to engage in wilfully and wantonly causing emotional distress through the use of abusive or obscene language does not exist. Actually, by its very nature, it provides an environment more prone to such occurrences because it provides a captive victim who may fear reprisal for complaining, so that the injury is exacerbated by repetition, and it presents a hierarchy of structured relationships which cannot easily be avoided. The opportunity for commission of the tort is more frequently presented in the workplace than in casual circumstances involving temporary relationships. This court acknowledged by its decision in *Bridges*, supra, that the tort could occur in the employment setting, although the complained-of actions there did not rise to the level of being tortious. The legislature in Georgia has recognized a need to guard against sex discrimination in employment, by adopting the Fair Employment Practices Act of 1978. OCGA Title 45, Ch. 19, Art. 2 covers public employment in state agencies.

Analogous is the public policy expressed by the legislature's having made obscene phone calls a criminal offense. OCGA § 46-5-21 (1). Direct communications of the same kind of personally ·obnoxious messages are not protected as a matter of law in the workplace.

On motion for summary judgment, the burden of showing the absence of any genuine issue of material fact rests upon movant, and the

party opposing the motion is given the benefit of all reasonable doubts and favorable inferences that may be drawn from the proof offered. *Anderson v. Redwal Music Co.*, 122 Ga. App. 247, 249 (176 SE2d 645) (1970). A reading of the case law in Georgia, particularly the cases cited above and the cases relied on in those decisions, reveals that to recover for the cause of action here asserted by Coleman against Robinson, the plaintiff must show 1) that defendant's behavior was wilful and wanton or intentionally directed to harming plaintiff; 2) that the actions of defendant were such as would naturally humiliate, embarrass, frighten, or outrage the plaintiff; 3) that conduct caused mental suffering or wounded feelings or emotional upset or distress to plaintiff.

In order to prevail at this stage, Robinson as movant for summary judgment must establish the absence of one element as a matter of law. *First of Ga. Ins. Co. v. Josey*, 129 Ga. App. 14, 15 (3) (198 SE2d 381) (1973). This he has failed to do.

That part of the judgment which is the subject of cross-appeal in 77915 must be affirmed.

2. Cross-appeal 77914 is brought by Cheokas and the Housing Authority from the denial of their motion for summary judgment on the issue of whether they retained Robinson after they knew or should have known of his alleged activity with female employees.

Although Coleman attempted to bring the matter to the attention of Cheokas, it is urged that she never mentioned that Robinson was sexually harassing her. While this is true, it does not absolve the employer. Knowledge could be actual or constructive. "A cause of action for negligence against an employer may be stated if the employer, in the exercise of reasonable care, should have known of an employee's reputation for sexual harassment and that it was foreseeable that the employee would engage in sexual harassment of a fellow employee but he was continued in his employment." *Cox v. Brazo*, 165 Ga. App. 888, 889 (1) (303 SE2d 71) (1983), aff'd 251 Ga. 491 (307 SE2d 474) (1983).

Therefore, if an ordinarily careful employer acting upon the information furnished could have reasonably discovered that its supervisor was inflicting emotional distress upon its employee, the employer could be found to have negligently retained the supervisor. "An employer may know, or in the exercise of due care have reason to know, of an employee's reputation for sexual harassment in the absence of complaints." *Favors*, supra at 483 (3).

A grievance procedure is mentioned in the testimony of various individuals, but nothing is shown about it other than the fact it was apparently seldom if ever used. Cheokas admitted that he was not familiar with it. In assessing an employer's responsibility and potential liability, federal courts have considered factors such as: whether

the employer had an express policy discouraging unlawful discrimination, provided a mechanism by which employees could complain, and promptly responded to the complaints. 45A AmJur2d 705, Job Discrimination, § 782. Similar principles should be applied in actions brought in this State.

When Coleman did attempt to air her problem with Cheokas he told her to see Robinson. He repeated this instruction even after she informed him that the problem involved Robinson. He reiterated that he treated all employee complaints in this manner and expected Robinson to handle personnel matters. The Housing Authority and Cheokas may not now successfully contend that Coleman did not inform them of the circumstances. Nor may they prevail by asserting lack of knowledge when the slightest investigation or merely permitting the employee to explain would have provided them with the knowledge they deny.

The dissent in *Meritor*, supra, argued that sexual harassment by the superior of an employee under his supervision should be imputed to the employer. See *Miller v. Honea*, 163 Ga. App. 421, 422 (294 SE2d 629) (1982). It is not necessary to go that far to hold in this instance that a jury could find that knowledge of facts which a cursory inquiry might have revealed should be imputed to the employer. Denial of summary judgment was not error.

3. The main appeal (77913) raises the issue of whether a jury question was presented regarding defendants Housing Authority and Cheokas hiring Robinson when they knew or should have known of his proclivity to sexually harass female employees.

The members of the Board, and thus the Housing Authority, stated with unanimity that they had no actual knowledge about any factors which would have disqualified Robinson prior to his hiring. However, there is evidence that at best they performed only a perfunctory investigation into Robinson's background before employing him. We thus must ascertain what a reasonable investigation would have revealed and whether there was any proof by Coleman which disputed the lack of knowledge.

Coleman testified that two of the commissioners told her that they knew about Robinson's background but were pressed for time to make a decision about a new director. One commissioner stated, so she testified, "they knew he had problems with women . . . he had problems on the job . . . that he loved women, and that ever [sic] place he'd ever worked, he'd had problems with women employees." This was knowledge acquired before Robinson was hired. The two commissioners, as well as Cheokas, denied this and stated they had no inkling of any adverse information about Robinson. They had been informed that Robinson had been charged with assault in an altercation with a maintenance man at his former place of employment, but

this had been explained to them to their satisfaction.

Although somewhat vague and not entirely satisfactory, this showing by Coleman was sufficient to counter the effort to establish as a matter of law that neither Cheokas nor the Housing Authority had any knowledge prior to employing Robinson.

Because it was never shown that Cheokas had any authority other than as chairman of a commission which collectively decided to hire and retain Robinson, Cheokas contends the lack of his individual liability was established as a matter of law. This argument was not offered before the trial court and was not a basis for its order. Although a judgment right for any reason will be affirmed, *Glynn County v. Palmatary*, 247 Ga. 570, 574 (277 SE2d 665) (1981), it is premature to decide whether any action by Cheokas in his individual capacity should be dismissed, because summary judgment was not sought on that limited ground and a jury question remains as to whether his official actions can form the basis for recovery.

That portion of the judgment granting summary judgment to Cheokas and the Housing Authority on the issue of negligent hiring must be reversed.

*Judgment reversed on main appeal 77913. Judgment affirmed on cross-appeals 77914 and 77915. Banke, P. J., and Birdsong, J., concur.*

DECIDED MARCH 9, 1989 —
REHEARING DENIED MARCH 30, 1989 — 

*Bensonetta Tipton Lane*, for Coleman.
*Mary Mendel Katz*, for Housing Authority.
*Thomas S. Chambless, Dawn G. Benson*, for Robinson.

