**Jackie MILLS and David Hill, Plaintiffs,**

v.

**AMOCO PERFORMANCE PRODUCTS, INC., Defendant.**

Civ. A. No. CV192–258.

United States District Court, S.D. Georgia, Augusta Division.

Dec. 23, 1994.

Joseph C. Nelson, III, Kesler T. Roberts, Nelson & Hill, Athens, GA, John Paul Batson, Augusta, GA, for plaintiffs.

William A. Clineburg, Jr., Hoyt Lane Dennard, Jr., Leticia D. Alfonso, King & Spalding, Atlanta, GA, Jeffrey S. Heller, Carolyn McKinney, Chicago, IL, for defendant.

## ORDER

BOWEN, District Judge.

For the reasons stated below, Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART**; Plaintiffs' Motion to Strike Unsworn Statements and Motion to Strike Affidavit of John Penny or in the Alternative to Take Further Deposition Testimony are **DENIED.**

## I. BACKGROUND

The Plaintiffs, Jackie Mills and David Hill, contend that Defendant Amoco Performance Products, Inc. (Amoco) violated Title VII of the Civil Rights Act of 1964, as amended, 42 U.S.C. § 2000e, et seq. Allegedly, Mills was sexually harassed as Amoco's employee and, after she filed a complaint with the Equal Employment Opportunity Commission (EEOC), Amoco retaliated against her and Hill, Mills' husband, who also worked at Amoco. In addition to the Title VII claims, Mills alleges a supplemental state law claim for intentional infliction of emotional distress.

Amoco hired Mills on December 11, 1989, to work in its plant in Augusta, Georgia. Amoco hired Hill on August 3, 1990, also to work in the Augusta plant. Plaintiffs first met each other while working at Amoco, began dating, and married on May 24, 1991.

On August 8, 1990, Robert D. Cadieux, an Amoco officer, sent a letter to each employee regarding its "revised non-harassment policy, designed to provide a working environment for all employees that is free of harassment of any kind." (Mills dep., June 8–10, 1993, Exh. D–3.). Plaintiffs deny having received this letter or other notice of the policy prior to the alleged sexual harassment in this case. The revised policy, a copy of which Amoco sent with each letter, defines and expressly prohibits sexual harassment and provides a complaint procedure whereby violations of the policy may be brought to the attention of management and appropriately addressed.

### Mills' sexual harassment claim

Mills began her employment with Amoco on shift A, the day shift, in the Production Department of Amoco's Fine Acids Unit. Mills alleges that she was first sexually harassed as an Amoco employee while working on shift A. According to Mills, male co-workers on the day shift often used obscene and hostile language in her presence and, many times, directed the offensive language at her. Mills further alleges that male co-workers on shift A referred to her on numerous occasions as a "stupid bitch," that they tried to look into the restroom at her, and that one male co-worker gestured toward her by grabbing his crotch. Mills alleges that she complained of the offensive conduct to Mike Remington, her supervisor on shift A, but no action was taken to stop the harassment.

In November of 1990, Amoco assigned Mills to the night shift, shift B, for reasons apparently unrelated to her allegations of sexual harassment on shift A. She was the only female on shift B. Mills maintains that she was sexually harassed on shift B. She alleges that between November, 1990, and June 4, 1991, she complained on numerous occasions of sexually-oriented misconduct of male co-workers to William Pletcher, her supervisor on shift B.[1] Mills alleges that she reported specific incidents of sexual harassment to Pletcher (some of which, the Court notes, were allegedly committed by Pletcher himself).[2] Mills contends that Pletcher never

---

1. From November, 1990, until September, 1991, Mills' supervisor on the night shift was Pletcher; thereafter, Deborah Harris was Mills' supervisor.

2. According to Mills, she reported the following alleged sexual harassment to Pletcher:
 Tony Quarles' [a co-worker] statement that the only way for a woman to get ahead was to 'suck on something this long,' ... The use of abusive and hostile language by co-workers ... The presence of pornographic materials at the workplace ... Pletcher's telephoning Mills at work and breathing heavily over the telephone ... Pletcher's referring to Mills as 'sugar britches' and 'sugar baby'... Not getting any

took steps to stop the sexual harassment and that it continued unabated. Mills alleges that in March, 1991, Pletcher himself implied to her that he would relieve her of an unwanted cleaning assignment plant workers refer to as "vessel entry"[3] if she would have sex with him, which she refused to do.[4]

There is no dispute that on June 4, 1991, Mills met with John Penny, Amoco's Personnel Director at the Augusta plant, and that she informed Penny that she had been sexually harassed on the job.[5] Mills alleges that Penny said he would investigate her allegations, but ultimately took no action reasonably calculated to end the offensive behavior. Amoco does not deny that Mills reported some alleged misconduct by Amoco employees to Penny on June 4, 1991.[6] Amoco contends, however, that Mills did not "provide any names or specifics concerning her allegations, stating that she did not want to get anyone in trouble other than [Tony] Quarles." (Def. Br., Jan. 28, 1994, at 6.) Amoco maintains that Penny immediately investigated the reported misconduct. Following Penny's investigation, Quarles received a written reprimand, and Amoco instructed supervisors to remind all employees of its nonharassment policy. Amoco contends Penny's action was responsive to every allegation by Mills that could be substantiated. The extent to which Penny later followed up with

---

help from co-workers ... Never being allowed to fill in for an absent senior operator when male co-workers were regularly permitted to so fill in[.]
(Pl.'s Br., Mar. 22, 1994, at 9) (deposition references omitted.)

3. Vessel entry duty involves cleaning a reactor.

4. Specifically, Mills avers: "[Pletcher] told me that women could sometimes get out of having to do [vessel entry] if they had sex with their supervisor. Mr. Pletcher was asking me to have sex with him in exchange for me getting out of having to clean the vessel. I told him I would not do that." (Mills aff. ¶ 36.)

5. According to Mills, she finally went to Penny for two reasons. First, Tony Quarles, a male coworker, allegedly assaulted her two days prior to June 4. Mills alleges that during the night shift on June 2, 1991, Quarles argued with her over some aspect of their respective job duties. The argument escalated and, according to Mills, "Quarles began screaming at Mills to 'get the fuck out of the control room' or words to that effect[,] while backing [her] up against a wall in the control room and [then, Quarles] grabbed Mills' radio transceiver from her hand." (Pl.'s Br., March 22, 1994, at 10.) Second, she had already gone to Pletcher and nothing had been done about her complaints.

6. The parties disagree about the extent of Mills' allegations to Penny. In her deposition, Mills contends that she reported the following alleged incidents of sexual harassment to Penny during their June 4, 1991, meeting:
William Pletcher's offering in March 1991 to relieve Mills of 'vessel entry' duty in exchange for her having sex with him ... Male workers peeking into the restroom while Mills occupied it ... William Pletcher's practice of calling Mills on the telephone while at work and breathing heavily into the telephone ... The presence of Playboy magazines and other pornographic materials throughout the plant ... Pletcher's practice of referring to Mills as 'sugar britches', 'sugar baby' and other demeaning terms ... Pletcher's approaching Mills at the workplace with chains wrapped around him and asking Mills whether she was 'kinky' and whether she 'liked whips and chains'... Co-worker's [sic] asking Mills to eat a banana in a sexually suggestive manner at the workplace ... Robert Harris' stating on a work radio that Mills was in a 'wet t-shirt contest' and that she was 'looking good'... Men gesturing toward Mills by grabbing their crotches, i.e. 'shaking their crotches'... Quarles' statements that the only way for women to succeed in their careers if [sic] to 'suck on something this long'... Quarles' statements that women do not belong in the workplace, that they should be at home 'on their backs' ... Mills not being allowed to fill in for the senior operator (Rob Harris) when he was absent from work, while male workers were allowed to work in that capacity ... Tommy Thompson showing plaintiff the 'centerfold' from a pornographic magazine ... The persistent use of obscene and hostile language in the workplace, i.e. the use of the terms 'motherfucker', 'cocksucker', 'blow job', and others ... Tommy Thompson's having asked to see Mills' breasts ... Tommy Thompson's having told Mills that she had a 'nice butt'... Co-workers referring to Mills as a 'stupid bitch'... Co-workers antagonizing Mills and making sexual comments as she ate a cream-filled cupcake at the workplace and the statement of one male worker at that time that he always thought Mills was a 'swallower, not a spitter'... The circulation of obscene and racist materials by bale workers ... The presence within the workplace of a rubber chicken with female genitalia drawn upon it and dressed in mock female underwear.
(Pl.'s Br., March 22, 1994, at 11–13) (deposition references omitted.) Amoco's account of what Mills actually reported to Penny is at p. 6 of its Jan. 28, 1994, brief.

Mills regarding her allegations is a contested factual matter.

Mills contends that the sexual harassment continued after her June 4, 1991, meeting with Penny. In particular, she alleges that after June 4, 1991, pornographic and obscene materials were distributed and displayed, or were otherwise present, at the plant. Mills alleges that she reported the conduct to Pletcher, but, again, to no avail.

On August 27, 1991, Mills saw Vincent Muller, Amoco's Production Supervisor at the Augusta plant, at a local grocery store. Mills reported to Muller the presence of pornographic materials at the plant.[7] Mills alleges that Muller directed her to send the offensive materials to him, but, because the materials were not present the next day at work, she did not.

On August 29, 1991, two days following her conversation with Muller, Mills filed her first charge of sexual harassment against Amoco with the EEOC. The charge states that the alleged sexual harassment complained of began in March, 1991, continuing thereafter.[8]

In October, 1991, Mills complained to Deborah Harris, her supervisor on shift B at that time, that she found a *Playboy* magazine at work. Harris called a meeting of the workers on shift B and informed them that such materials at work were unacceptable and that anyone caught with such magazines would be subject to termination. According to Amoco, all file cabinets and desks in the work area were searched for offensive magazines in an effort to expunge the work place of pornography.

On October 24, 1991, Mills met with Penny and three other supervisors in response to Mills' complaints of sexual harassment. Hill was present at the meeting. Amoco alleges that Mills again failed to be specific with her allegations and its ability to take corrective action was limited accordingly.

On November 8, 1991, Mills met again with Penny to discuss her allegations of sexual harassment. According to Amoco, after investigating Mills' allegations, it concluded "that it had addressed any improper behavior and the remaining allegations either could not be substantiated or were gross mischaracterizations." (Def.'s Br., Jan. 28, 1994, at 15.) On December 4, 1991, Mills filed a charge of discrimination with the Richmond County Human Relations Commission (RCHRC), alleging that she was still experiencing sexual harassment on the job.

Mills contends that on or about December 24, 1991, she saw a photograph displayed on a desk in the fine acids unit of the plant of a woman engaged in oral sex with a man. She alleges that she immediately complained to Penny about the photograph. The photograph was subsequently removed.

### The alleged retaliation against Mills

In August of 1991, Mills informed Amoco supervisors that she was attempting to become pregnant and, consequently, would like to be considered for a position that did not expose her to chemicals. In December, 1991, Mills informed her supervisors that she was pregnant. Amoco did not transfer Mills to another position until presented with a doctor's report confirming her pregnancy.

Beginning in November, 1991, Mills received a series of counselling and disciplinary "write-ups" for wearing her company uniform off the premises of the plant.[9] There is no dispute that Amoco policy prohibits employees from wearing company uniforms off the premises of the plant. Mills contends, however, that this policy was rarely enforced and that some co-workers regularly wore their uniforms home without being cited. On January 24, 1992, Mills was written up by Harris for violating Amoco's rule against wearing its uniforms off company premises. On January 24, 1992, Mills filed another charge of discrimination with the RCHRC,

---

7. The Court notes that Mills contends in her affidavit that Muller is one of the individuals who at times sexually harassed her.

8. The parties do not indicate in their briefs the outcome of the administrative investigations in this case. There is no dispute, apparently, that

Plaintiffs exhausted their administrative remedies then timely filed this lawsuit.

9. Amoco sometimes utilized a "Written Reminder Discussion Guide," a form of discipline at Amoco, to correct employees for procedural, policy, or safety violations.

alleging that other employees wore their uniforms home with impunity and that Harris retaliated against her for filing a charge with the EEOC by disciplining her.

### The alleged retaliation against Hill

On October 24, 1991, Harris issued a written reminder to Hill for various acts of noncompliance with Amoco operating procedures. Hill contends Harris retaliated against him for Mills' EEOC complaint by writing him up. Amoco maintains that it was not aware prior to citing Hill on October 24, 1991, that Mills had filed a charge with the EEOC or that Plaintiffs were married. Amoco received formal notice of Mills' charge from the EEOC on October 28, 1991. Hill alleges, however, that on October 21, 1991, Penny telephoned Mills at her home and told her that he desired to meet with her about her allegations of sexual harassment and indicated that he knew of her charge of discrimination with the EEOC. On December 26, 1991, Hill filed a charge with the RCHRC, alleging that Amoco retaliated against him for Mills' EEOC charge by writing him up on October 24, 1991.

Hill's October 24, 1991, citation for various safety and performance related problems remained "active" under Amoco's discipline policy until July 23, 1992. On February 1, 1992, Hill became eligible for a wage increase, but Amoco denied the increase, purportedly because Hill's written reminder was active. On May 29, 1992, Hill filed another charge with the RCHRC, alleging that Amoco denied his raise in retaliation for Mills' EEOC charge.

On August 2, 1992, Hill voluntarily resigned his employment with Amoco. Prior to August 2, 1992, Amoco announced a voluntary severance plan. Under the plan, eligible employees, including Hill, had to request voluntary severance before July 18, 1992, to qualify for severance benefits. Hill did not request voluntary severance prior to July 18, 1992. Amoco did not allow Hill to participate in the voluntary severance plan. On October 1, 1992, Hill filed a third charge with the RCHRC, alleging that Amoco denied him severance benefits in retaliation for Mills' EEOC charge.

### Amoco's Motion

In support of its motion, Amoco argues that Mills' Title VII claim for sexual harassment and Hills' first retaliation claim arose before the effective date of the Civil Rights Act of 1991, and, therefore, they can not recover compensatory or punitive damages for these claims, nor are they entitled to a trial by jury on these claims. Second, Amoco argues that Mills' Title VII claim for alleged misconduct that occurred prior to March 2, 1991, is time barred because she did not file her charge with the EEOC until August 29, 1991. Third, Amoco contends that Mills' sexual harassment claim fails as a matter of law because (1) it neither knew nor had reason to know of any of the alleged incidents of harassment until June 4, 1991, when Mills first reported them to Penny and, then, it conducted a reasonable and prompt investigation of the allegations; and (2) any harassment that actually occurred was not sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment. Fourth, Amoco argues that Plaintiffs' Title VII retaliation claims fail as a matter of law because neither Plaintiff can establish a prima facie case of retaliation. Fifth, regarding Mills' supplemental state law claim for intentional infliction of emotional distress, Amoco argues that the conduct complained of was not so severe that it could constitute intentional infliction of emotional distress and, furthermore, the acts complained of, if they occurred, occurred outside the scope of the subject employees' employment with Amoco. Sixth, Amoco argues that if the Court dismisses Plaintiffs' federal claims, the Court should dismiss the supplemental state law claims as well.

### Plaintiffs' Motions

Plaintiffs' Motion to Strike Unsworn Statements concerns the unsworn statements of Plaintiffs' coworkers Raymond L. Chapman, John A. Donohue, Mike Earnest, Robert D. Galloway, Todd Gray, Robert S. Harris, Archie Harvey, Gurjit Jalli, Zack Meeler, Mark H. Roper, Jr. and Philip Weaver, tendered by Amoco in support of its Motion for Summary Judgment. Plaintiffs argue that these statements are not properly submitted in support of Defendant's Rule 56 motion and

should not be considered by the Court. Plaintiffs contend that because the statements are not subscribed by the affiants as true under penalty of perjury, nor sworn before an officer authorized to administer oaths, they should be stricken from the record.

In their Motion to Strike Affidavit of John Penny or in the Alternative to Take Further Deposition Testimony, Plaintiffs argue that Penny's affidavit should not be considered by the Court because (1) it was served after Amoco filed its summary judgment motion and therefore was untimely, *see* Rule 6(d), Fed.R.Civ.P., and (2) it contains hearsay. Alternatively, Plaintiffs ask that the Court permit them to depose Penny to respond to the affidavit.

## II. ANALYSIS

### A. *Defendant's Motion for Summary Judgment*

■ The Court should grant summary judgment only if "there is no genuine issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The applicable substantive law identifies which facts are material in the case. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986).

■ "The moving party bears the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.,* 929 F.2d 604, 608 (11th Cir.1991). When the *moving* party has the burden of proof at trial, that party must carry its burden at summary judgment by presenting evidence affirmatively showing that, "on all the essential elements of its case ..., no reasonable jury could find for the non-moving party." *United States v. Four Parcels of Real Property,* 941 F.2d 1428, 1438 (11th Cir.1991) (en banc). When the *non-moving* party has the burden of proof at trial, the moving party may carry its burden at summary judgment either by presenting evidence negating an essential element of the non-moving party's claim or by pointing to specific portions of the record which demonstrate that the non-moving party cannot meet its burden of proof at trial, *see Clark,* 929 F.2d at 606–608 (explaining *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)); merely *stating* that the non-moving party cannot meet its burden at trial is *not* sufficient, *Clark,* 929 F.2d at 608. Any evidence presented by the movant must be viewed in the light most favorable to the non-moving party. *Adickes,* 398 U.S. at 157, 90 S.Ct. at 1608.

■ If—and *only* if—the moving party carries the initial burden, then the burden shifts to the non-moving party "to demonstrate that there is indeed a material issue of fact that precludes summary judgment." *Clark,* 929 F.2d at 608. The non-moving party cannot carry its burden by relying on the pleadings or by repeating conclusory allegations contained in the complaint. *Morris v. Ross,* 663 F.2d 1032, 1033–34 (11th Cir. 1981), *cert. denied,* 456 U.S. 1010, 102 S.Ct. 2303, 73 L.Ed.2d 1306 (1982). Rather, the non-moving party must respond by affidavits or as otherwise provided in Fed.R.Civ.P. 56. "[T]he evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Anderson,* 477 U.S. at 255, 106 S.Ct. at 2513. A genuine issue of material fact will be said to exist "if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Id.* at 248, 106 S.Ct. at 2510.

The clerk has given the non-moving party notice of the summary judgment motion, the right to file affidavits or other materials in opposition, and of the consequences of default; thus, the notice requirements of *Griffith v. Wainwright,* 772 F.2d 822 (11th Cir. 1985), are satisfied. The time for filing materials in opposition has expired, and the motion is ripe for consideration. The Court will proceed to review the applicable substantive law and inquire whether the moving party—and, if necessary, the non-moving party—has carried the burden set forth above. *See Clark,* 929 F.2d at 609 n. 9. Amoco's several arguments at summary judgment are addressed *seriatim.*

### 1. The applicability of the Civil Rights Act of 1991

On November 21, 1991, President Bush signed into law the Civil Rights Act of 1991 (the 1991 Act), P.L. 102–166, 105 Stat. 1074, codified at 42 U.S.C. § 1981a. Prior to November 21, 1991, successful Title VII claimants could not recover compensatory and punitive damages. Only equitable relief could be obtained. Hence, Title VII plaintiffs were not entitled to a jury trial on demand. Under the 1991 Act, successful Title VII plaintiffs may recover compensatory and punitive damages, and Title VII plaintiffs who seek such legal relief are, of course, entitled to a jury trial. 42 U.S.C. § 1981a(b), (c). The Supreme Court has held that the new remedial provisions of Title VII promulgated in the 1991 Act are not to be applied retroactively to pre-enactment conduct, however. *Landgraf v. USI Film Products,* —— U.S. ——, 114 S.Ct. 1483, 128 L.Ed.2d 229 (1994).

█ Amoco argues that Mills' sexual harassment claim and Hill's first retaliation claim are not governed by the 1991 Act since they are based, according to Amoco, solely on pre-enactment conduct. Actually, Mills' hostile environment sexual harassment claim comprises an alleged pattern of conduct that continued up to December 24, 1991, after the effective date of the 1991 Act. Amoco erroneously assumes that Mills' hostile environment claim was cut off at August 29, 1991, the date she filed her EEOC charge. The alleged acts of sexual harassment that occurred after she filed her complaint with the EEOC were not discrete and independent acts of sexual harassment, *see Ray v. Freeman,* 626 F.2d 439, 442–43 (5th Cir.1980), *cert. denied,* 450 U.S. 997, 101 S.Ct. 1701, 68 L.Ed.2d 198 (1981), but additional components of one cause of action for an alleged sexually hostile environment. "A hostile environment claim is a single cause of action rather than a sum total of a number of mutually distinct causes of action to be judged each on its own merits." *Vance v. Southern Bell Tel. and Tel. Co.,* 863 F.2d 1503, 1511 (11th Cir.1989). *See also Hansel*

*v. Public Service Co. of Colorado,* 778 F.Supp. 1126, 1134 (D.Colo.1991). Mills' judicial complaint " 'may encompass any kind of discrimination like or related to the allegations contained in the [EEOC] charge and growing out of such allegation during the pendency of the case before the Commission.' " *Sanchez v. Standard Brands, Inc.,* 431 F.2d 455, 466 (5th Cir.1970) (quoting *King v. Georgia Power Co.,* 295 F.Supp. 943, 947 (N.D.Ga.1968)); *see also Coon v. Georgia Pacific Corp.,* 829 F.2d 1563, 1569 (11th Cir. 1987); *Oubichon v. North Am. Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973).

The alleged acts of sexual harassment that followed Mills' EEOC charge—principally, pornographic materials conspicuously present at the plant—were reasonably related to the conduct reported to the EEOC. The scope of the EEOC's investigation of Mills' charges presumably should have been broad enough to disclose the conduct Mills alleges occurred after she complained to the EEOC. Another EEOC charge was not necessary. Thus, Mills' hostile environment sexual harassment claim consists of conduct that occurred before *and* after November, 21, 1991. And, although Hill's first retaliation claim indeed accrued before November 21, 1991, he alleges repeat retaliation after November 21, 1991.

█ *Landgraf* did not involve a cause of action based on conduct that, as here, occurred both before *and* after November 21, 1991. Nevertheless, the Supreme Court made clear that the remedial provisions of the 1991 Act for compensatory and punitive damages and trial by jury do not apply to pre-enactment conduct. —— U.S. ——, 114 S.Ct. 1483. Thus, under *Landgraf,* Plaintiffs cannot recover compensatory or punitive damages for any pre-enactment conduct that constitutes actionable sexual harassment. *Cf. Munday v. Waste Management of North America, Inc.,* 858 F.Supp. 1364 (D.Md.1994). Plaintiffs can, however, recover such damages for post-enactment conduct that constitutes sexual harassment under Title VII.[10]

10. Plaintiffs' argument that the remedial provisions of the 1991 Act apply to their causes of action on a continuing violation theory misconceives the proper context of the continuing violation theory, which, as shown below, concerns

■ Amoco incorrectly argues that Plaintiffs are not entitled to a jury trial on Mills' hostile environment claim or Hill's first retaliation claim. The fact that Plaintiffs may recover only equitable relief for pre-enactment conduct violative of Title VII does not bar a jury trial of their claims based on pre-enactment conduct. *See Curtis v. Loether,* 415 U.S. 189, 94 S.Ct. 1005, 39 L.Ed.2d 260 (1974); *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 82 S.Ct. 894, 8 L.Ed.2d 44 (1962); *Lincoln v. Board of Regents of the Univ. System of Georgia,* 697 F.2d 928 (11th Cir.1983). The Plaintiffs' causes of action, to the extent based on post-enactment conduct, are legal in nature. "When legal and equitable actions are tried together, the right to a jury in the legal action encompasses the issues common to both. When a party has the right to a jury trial on an issue involved in a legal claim, the judge is of course bound by the jury's determination of that issue as it affects his disposition of an accompanying equitable claim." *Lincoln,* 697 F.2d at 934 (citations omitted). Amoco's argument that the Court should dismiss or strike Plaintiffs' prayer for a jury trial insofar as their Title VII claims are based on pre-enactment conduct would necessitate bifurcation of the trial, which the Court declines to allow in this case.

**2. Whether Plaintiff Mills' sexual harassment claim is time-barred to the extent based on conduct that occurred prior to March 2, 1991**

Amoco contends that the alleged acts of sexual harassment prior to March 2, 1991, are time barred because Mills filed her EEOC complaint on August 29, 1991. Title VII requires that a charge of unlawful discrimination be filed with the EEOC within 180 days of the incident.[11] 42 U.S.C. § 2000e-5(e). Although the date of Mills' EEOC charge is not disputed, Mills asserts that her sexual harassment claim is for a "continuing violation" of Title VII and, therefore, that the acts of sexual harassment pre-

dating the beginning of the 180 day filing period are nevertheless germane to her hostile environment claim.

■ The continuing violation theory, where applicable, "relieves a plaintiff ... from the burden of proving that the entire violation occurred within the actionable period." *Berry v. Board of Sup'rs of L.S.U.,* 715 F.2d 971, 979 (5th Cir.1983). To establish a continuing violation, the plaintiff must prove "'a series of related acts, one or more of which falls within the 180 day period....'" *Id.* (quoting B. Schlei & P. Grossman, *Employment Discrimination Law,* 232 (Supp. 1979)). *See also Coon,* 829 F.2d at 1563; *Berry,* 715 F.2d at 981 (canvassing relevant factors to proving a continuing violation). Mills' hostile environment sexual harassment claim is an archetypal continuing violation claim, composed of many alleged acts that occurred within the limitations period. In any event, Amoco's argument at summary judgment overlooks the question of whether there was a continuing violation of Title VII and, therefore, necessarily fails to show under Rule 56 that it is entitled to summary resolution against Mills with respect to conduct that antedates March 2, 1991.

**3. The merits of Mills' sexual harassment claim.**

■ Title VII's proscription against sex-based discrimination obligates employers to provide a work place free of sexual harassment.[12] *Meritor Sav. Bank, FSB v. Vinson,* 477 U.S. 57, 72, 106 S.Ct. 2399, 2408, 91 L.Ed.2d 49 (1986). Sexual harassment is actionable under Title VII only if the objectionable conduct is "sufficiently severe or pervasive 'to alter the conditions of [the victim's] employment and create an abusive working environment.'" *Id.* at 67, 106 S.Ct. at 2405 (quoting *Henson v. City of Dundee,* 682 F.2d 897, 904 (11th Cir.1982)). *See also Harris v. Forklift Systems, Inc.,* —— U.S. ——, 114 S.Ct. 367, 126 L.Ed.2d 295 (1993).

only the limitations period for instituting administrative proceedings.

11. Amoco correctly observes that § 2000e-5(e)'s provision for a 300 days limitations period does not apply here.

12. Title VII makes it unlawful "to discriminate against any individual with respect to his compensation terms, conditions, or privileges of employment, because of such individual's ... sex[.]" 42 U.S.C. § 2000e-2(a)(1).

Unfortunately, there is no formula or other means of mechanical application to determine whether sexual harassment is actionable under Title VII. Whether sexual harassment is sufficiently severe or pervasive to support a Title VII remedy must be determined upon the "totality of the circumstances." *Henson,* 682 F.2d at 904.

■ There are two genres of sexual harassment actionable under Title VII: hostile environment cases and *quid pro quo* cases. *See generally Henson,* 682 F.2d 897. Hostile environment sexual harassment entails a pattern of conduct in the work place that unreasonably interferes with an employee's job performance by creating a hostile, intimidating, or offensive work environment. *Vinson,* 477 U.S. at 65, 106 S.Ct. at 2404. A *quid pro quo* case involves a supervisor's attempt to garner sexual consideration from an employee by offering job benefits as a *quid pro quo. Henson,* 682 F.2d at 908–11. Mills asserts both types of sexual harassment.

### a. Mills' hostile environment claim

■ Mills alleges that acts of sexual harassment by her co-workers and supervisors effected an abusive, hostile work environment. Amoco contends at summary judgment that it cannot be held liable for the alleged hostile environment because it "neither knew nor had reason to know of any alleged harassment by Pletcher or Mills' co-workers prior to her June 4[, 1991] meeting with … Penny" (Def.'s Br., Jan. 28, 1994, at 31) and that once apprised of Mills' allegations (on June 4, 1991), it took "reasonable and prompt steps to investigate and address her concerns on each occasion that she provided sufficient information to allow it to investigate." (*Id.*) Amoco thus contends that "under applicable law, it cannot be held liable for this alleged misconduct predating June 4, 1991." (*Id.*)

Mills counters with summary judgment evidence sufficiently probative to raise a triable issue of fact as to whether Amoco knew or should have known, prior to June 4, 1991, of the alleged sexual harassment. She avers in her sworn affidavit that she repeatedly complained of the alleged misconduct to her immediate supervisors on shifts A and B, well prior to June 4, 1991. Further, the conduct that occurred, if Mills' evidence is believed, consisted of a continual pattern of offensive, sexually suggestive and explicit acts and comments by her male counterparts and supervisors. The alleged conduct was frequent and nondiscrete; it would not easily go unnoticed by shift supervisors or others in managerial positions who interacted with Mills and her coworkers on a regular basis. Drawing all reasonable inferences from the summary judgment record in Mills' favor, as the Court must, a jury could find that Mills' mistreatment was conspicuous and should have been apparent to management, a finding that would raise an inference of constructive knowledge. *Huddleston v. Roger Dean Chevrolet, Inc.,* 845 F.2d 900, 904 (11th Cir. 1988). *See also Henson,* 682 F.2d at 905. Hence, Mills' evidence demonstrates a genuine issue of material fact on the question of whether before June 4, 1991, Amoco had knowledge, actual or constructive, of the alleged sexual harassment.

■ Amoco's argument that measures it took in response to the June 4, 1991, meeting between Mills and Penny absolves it of liability as a matter of law fails for two reasons. First, the argument is erroneously predicated upon Amoco's failed summary judgment contention that its first notice of the sexual harassment was received on June 4, 1991. As discussed above, the question of when Amoco first received notice of Mills' complaints, triggering its duty under Title VII to take swift remedial action, is a contested factual matter. At this stage of the litigation, all of Mills' remonstrance to supervisors—not just her June 4, 1991, complaint to Penny and subsequent complaints to management—is relevant. Mills contends and presents evidence that she reported sexual harassment to Remington, her supervisor on the day shift, and to Pletcher, her first supervisor on the night shift. Amoco does not argue and tenders no evidence that it took responsive measures to these reports of sexual harassment to its supervisors. There is a material factual dispute, moreover, as to what conduct Mills actually reported to Penny. Amoco's argument that it discharged its

duty under Title VII by taking adequate corrective measures after June 4, 1991, presupposes that Mills reported only five incidents of sexual harassment to Penny. (Def.'s Br., Jan. 28, 1994, at 32). Mills' evidence shows that her allegations to Penny included more than those five incidents. (*See* note 6, *supra.*) Since there is a genuine issue of material fact regarding what Mills actually told Penny, Amoco could prevail on its motion only by showing that it took action reasonably calculated to address all of the conduct Mills alleges that she reported to Penny.

Second, Mills presents evidence sufficient to raise a triable factual issue as to whether the corrective action taken by Amoco after June 4, 1991, was reasonably calculated to end the harassment.[13] There is no question that Amoco responded after June 4, 1991: *inter alia,* Quarles was reprimanded, supervisors were instructed to remind employees of the non-harassment policy, Harris admonished her employees not to circulate pornographic materials and conducted a search for such materials, and, on several occasions, supervisors met with Mills to discuss her allegations. On the evidence before me, however, this action, or any other of which Amoco presents evidence, cannot be determined sufficiently responsive to Mills' allegations to exonerate Amoco of Title VII liability as a matter of law.

No worker other than Tony Quarles was even reprimanded. Accepting Mills' evidence as true, numerous individuals, not just Tony Quarles, should have been sanctioned for violating Amoco's anti-harassment policy. (*See* note 6, *supra.*) Amoco's contention that an absence of specificity in Mills' allegations to Penny hampered its investigation is not at all helpful at summary judgment. "Title VII imposes on employers an affirmative duty to seek out and eradicate a hostile work environment." *Hansel,* 778 F.Supp. at 1133. "A duty to conduct further investigations arises when a report or reports of sexual harassment to management suggests that the workplace may be charged in a sexually hostile

manner...." *Robinson v. Jacksonville Shipyards, Inc.,* 760 F.Supp. 1486, 1530 (M.D.Fla.1991). If all of Mills' evidence is true, a jury could find that a reasonably thorough investigation would have revealed individuals other than Quarles who harassed her and deserve appropriate discipline. *See Ellison v. Brady,* 924 F.2d 872, 881–83 (9th Cir.1991); *see also* 29 C.F.R. § 1604.11(f). At a minimum, Mills raises a triable factual issue as to whether the investigative, disciplinary and other corrective measures taken by Amoco were reasonably calculated to halt the harassment.

Amoco argues that it is entitled to summary judgment on Mills' sexual harassment claim because the alleged misconduct that occurred *after* June 4, 1991, was not sufficiently severe or pervasive to alter the conditions of Mills' employment and create an abusive working environment. In advancing this summary judgment argument, Amoco again misplaces reliance on its false contention that the alleged conduct predating June 4, 1991, is, as a matter of law, not part of Mills' cause of action. Amoco lists five incidents upon which, it believes, Mills' hostile environment claim may be based. (Def.'s Br., Jan. 28, 1994, at 33–34.) Amoco then argues that these incidents in the aggregate are not sufficiently severe or pervasive to sustain her claim. Without regard to this contention, which fails for reasons already stated, the Court concludes that the entirety of Mills' allegations, if proven, may indeed establish a violation of Title VII on a hostile environment theory. The Court need not review here the revolting, lurid details of Mills' allegations; the parties know what they are. Mills' evidence tends to show that over a period of many months she was subjected to a continual pattern of sexually-oriented misconduct that any reasonable woman would find highly offensive. A jury could readily find that the conduct in question created a hostile, abusive, work environment, that unreasonably interfered with Mills' performance of her job.

---

**13.** The Court notes here that the existence of a formal grievance procedure does not, in and of itself, insulate employers from liability for sexual

harassment. *See generally Vinson,* 477 U.S. at 72, 106 S.Ct. at 2408.

### b. Mills' quid pro quo claim

Amoco argues that Mills' sexual harassment claim on a *quid pro quo* theory fails as a matter of law because (1) Mills did not submit to Pletcher's alleged demands and (2) she did not perform the vessel entry. (Def.'s Br., Apr. 18, 1994, at 3.) Amoco contends, essentially, that there was no *quid pro quo*. *See Steele v. Offshore Shipbuilding, Inc.*, 867 F.2d 1311, 1315 (11th Cir.1989).

 That Mills did not actually have sex with Pletcher or perform the vessel entry, however, does not necessarily preclude a prima facie showing of *quid pro quo* sexual harassment. There is no formulaic test for a prima facie case of *quid pro quo* sexual harassment. *See Henson*, 682 F.2d at 911 n. 22. The elements of a prima facie *quid pro quo* case vary according to the specific facts of the case. *Id.* The EEOC guidelines, to which courts "may properly resort for guidance," *Vinson*, 477 U.S. at 65, 106 S.Ct. at 2404, states that sexual harassment violative of Title VII includes "requests for sexual favors ... when ... submission to such conduct is made either explicitly or implicitly a term or condition of an individual's employment[.]" 29 C.F.R. § 1604.11(a)(1).

 The conditioning of a job benefit (or avoidance of a job detriment) on sexual consideration by a subordinate employee is the quintessence of *quid pro quo* sexual harassment.[14] *See Spencer v. General Elec. Co.*, 894 F.2d 651, 658 (4th Cir.1990) (*quid pro quo* sexual harassment occurs when "sexual consideration is demanded in exchange for job benefits"); *Highlander v. K.F.C. Nat. Management Co.*, 805 F.2d 644, 648 (6th Cir.1986) (*quid pro quo* sexual harassment occurs when "submission to the unwelcome sexual advances of supervisory personnel [is] an express or implied condition for receiving job benefits"). And that is what Mills alleges. She contends that in March, 1991, Pletcher implied that he would relieve her of an undesirable job duty in exchange for sex. Mills' evidence, her personal affidavit and deposition, if believed, tends to show that Pletcher misappropriated his authority over her by *attempting* to extract sexual favors.[15]

Amoco argues that Mills' *quid pro quo* claim is barred because Mills "never filed a charge accusing Pletcher of any harassment at all." (Def.'s Br., Apr. 18, 1994, at 4 n. 1.) To the contrary, Mills' August 29, 1991, charge with the EEOC indicates, among other things, sexual harassment by Bill Pletcher.[16]

### 4. The retaliation claims

 Amoco argues that it is entitled to summary judgment on Plaintiffs' retaliation claims because they have not established prima facie cases of retaliation. In order to make a prima facie case of retaliation, Plaintiffs must establish (1) statutorily protected expression, (2) adverse employment action, and (3) a causal link between the protected expression and the adverse action. *Goldsmith v. City of Atmore*, 996 F.2d 1155, 1163 (11th Cir.1993). The first two elements of Plaintiffs' respective prima facie cases are not at issue on Amoco's Motion.

 Amoco argues that Mills' sexual harassment charges with the EEOC and the adverse employment action taken against her and Hill are not causally linked. Plaintiffs are not required to establish a concrete nex-

---

**14.** Amoco makes no argument that Pletcher was not a supervisor who possessed actual or apparent authority to "hire, fire, discipline or promote." *Miller v. Bank of America*, 600 F.2d 211, 213 (9th Cir.1979). That he was is assumed for summary judgment purposes.

**15.** Amoco does present evidence that oppugns Mills' allegations, including Pletcher's categorical denial that he propositioned Mills. The Court acknowledges this evidence and is mindful that a false charge of this nature against a supervisor is very easy to make and can be as damaging and invidious as the conduct Title VII is designed to prohibit. It is not the province of the Court at this stage, however, to resolve a disputed issue of fact, but only to determine whether the summary judgment evidence, on balance, merits a trial. Here it does.

**16.** In her complaint to the EEOC, Mills stated: "I believe I am being discriminated against due to my sex (female) in that: ... [a]pproximately May, 1991, I spoke with the Personnel Director, John Penny, regarding harassment by ... my supervisor, Bill Pletcher." (Mills dep., June 8–10, 1994, Exh D–4, III, D.)

us between the protected expression and the adverse employment action.

> [T]he causal link in the [retaliatory discharge] formula [is not] the sort of logical connection that would justify a prescription that the protected participation in fact prompted the adverse action. Such a connection would rise to the level of direct evidence of discrimination, shifting the burden of persuasion to the defendant. Rather, we construe the 'causal link' element to require merely that the plaintiff establish that the protected activity and the adverse action *were not wholly unrelated*.

*Weaver v. Casa Gallardo, Inc.*, 922 F.2d 1515, 1525 (11th Cir.1991) (emphasis supplied). Under this standard, I find both Plaintiffs have shown prima facie cases of retaliation. Each and every contention advanced by the parties on this issue need not be addressed here, for summary judgment purposes. The close proximity in time of the complaint to the EEOC and subsequent disciplinary measures by the Defendant is sufficient, in this case, to raise a triable factual issue as to whether the disciplinary measures were wholly unrelated to the EEOC charge. *See Donnellon v. Fruehauf Corp.*, 794 F.2d 598, 601 (11th Cir.1986).[17]

■ The well known burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) applies to retaliation cases. *Whatley v. Metropolitan Atlanta Rapid Transit Authority*, 632 F.2d 1325, 1327–28 (5th Cir.1980). Under *McDonnell Douglas*,

> the plaintiff has the burden of proving by the preponderance of the evidence a prima facie case of discrimination. Second, if the plaintiff succeeds in proving the prima facie case, the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employee's rejection.' Third, should the defendant carry this burden, the plaintiff must then have an opportunity to prove by a preponderance of the

evidence that the legitimate reasons offered by the defendant were not its true reasons, but were a pretext for discrimination.

*Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 252–53, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981) (quoting *McDonnell Douglas*, 411 U.S. at 802, 93 S.Ct. at 1824) (citations omitted). Importantly, the plaintiff at all times carries the ultimate burden of proving by the preponderance of the evidence that the challenged employment decision was motivated by discriminatory animus. *See id.* at 253, 101 S.Ct. at 1093.

■ Amoco articulates specific, nondiscriminatory reasons for disciplining Plaintiffs. In short, Amoco maintains that Plaintiffs' failure to comply with safety and operations policies and procedures warranted disciplinary measures. This assertion is sufficient to meet Amoco's burden under *McDonnell Douglas* and, therefore, the burden of proof devolves to Plaintiffs to show with credible evidence a genuine issue of material fact as to whether Amoco's proffered explanation is merely pretext for retaliation. *See Hairston v. Gainesville Sun Pub. Co.*, 9 F.3d 913, 919 (11th Cir.1993).

■ When a plaintiff in a discrimination case has made a prima facie showing, caution militates against summary resolution of the inherently elusive factual issue of motive. *See id.* at 920–21; *Lowe v. City of Monrovia*, 775 F.2d 998, 1009 (9th Cir.1985). Direct evidence of discriminatory animus is rarely available, and resolution of the issue of pretext on a body of circumstantial evidence will many times turn in large part on the credibility of testimony. "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255, 106 S.Ct. at 2513. On a motion for summary judgment, the only issue for the Court to decide once the moving party meets its initial burden is whether the nonmovant's evidence is enough to place material facts in issue. *See*

---

17. Regarding Hill's first retaliation claim, Amoco's notice of Plaintiffs' marriage prior to October 24, 1991, and notice of Mills' EEOC complaint prior to October 28, 1991, may be estab-

lished circumstantially. On these two points, Plaintiffs point to evidence and facts of record sufficient to withstand Amoco's summary judgment argument.

*Hairston,* 9 F.3d at 921. And, to accomplish this in a Title VII case, the plaintiff does not necessarily have to produce evidence beyond that which establishes a prima facie case of discrimination. "Indeed, there may be some cases where the plaintiff's initial evidence, combined with effective cross-examination of the defendant, will suffice to discredit the defendant's explanation." *Burdine,* 450 U.S. at 256 n. 10, 101 S.Ct. at 1095 n. 10.

■ With the foregoing considerations in mind, I find that Plaintiffs' evidence of retaliation is sufficient to survive Amoco's Motion. Though the specificity and completeness of Amoco's explanation for the disciplinary action taken against Mills and Hill make a forceful showing within *Burdine*'s burden-shifting framework, the circumstances of the disciplinary measures, timing in particular, and Plaintiffs' sworn averments that they were treated disparately from co-workers guilty of policy and procedural infractions are sufficient under Rule 56 to preclude summary resolution of this issue.

### 5. Mills' intentional infliction of emotional distress claim

Amoco argues that Mills' allegations of sexual harassment are insufficient under Georgia law to support a claim for intentional infliction of emotional distress under Georgia law.[18] Amoco further argues that it cannot be held vicariously liable for the alleged wrongful conduct because the conduct occurred outside the scope to the employees' employment.

■ In Georgia, a cause of action for intentional infliction of emotional distress requires a showing (1) that the defendant's behavior was wilful and wanton or intended to harm the plaintiff; (2) that the actions were of the sort that would naturally humiliate, embarrass, frighten, or outrage the plaintiff; and (3) that the defendant's conduct proximately caused mental suffering, wounded feelings, or emotional upset or distress to the plaintiff. *Coleman v. Housing*

*Auth. of Americus,* 191 Ga.App. 166, 170, 381 S.E.2d 303 (1989). *See also Bridges v. Winn–Dixie Atlanta, Inc.,* 176 Ga.App. 227, 335 S.E.2d 445 (1985). The standard for stating a claim for intentional infliction of emotional distress under Georgia law, generally speaking, is stringent. *See Moses v. Prudential Ins. Co. of America,* 187 Ga.App. 222, 369 S.E.2d 541 (1988). " 'The law intervenes only where the distress inflicted is so severe that no reasonable man could be expected to endure it....' " *Id.* at 226, 369 S.E.2d 541 (quoting The Restatement (Second) of Torts, Ch. 2, Emotional Distress, § 46(1), comment j).

■ The Court need not determine whether Mills' allegations rise to the requisite level of severity to support a claim under Georgia law for intentional infliction of emotional distress. Although a cause of action for intentional infliction of emotional distress may lie against a supervisor or co-worker, *see, e.g., Coleman,* 191 Ga.App. 166, 381 S.E.2d 303, Mills has no cause of action against Amoco for this tort because the alleged sexual harassment was not committed in furtherance of Amoco's business. *See generally Favors v. Alco Mfg. Co.,* 186 Ga.App. 480, 482, 367 S.E.2d 328 (1988). The acts complained of, assuming they occurred, occurred outside the scope of the employees' jobs. *Accord id.* Mills' allegations are legally insufficient to support her claim of intentional infliction of emotional distress. Under Rule 56, Amoco prevails against Mills on her state law claim as a matter of law.[19]

■ A cause of action for negligence may obtain against a corporate employer who, failing to exercise reasonable care, hires an individual reputed for sexual harassment. *See Cox v. Brazo,* 165 Ga.App. 888, 303 S.E.2d 71 (1983), *aff'd,* 251 Ga. 491, 307 S.E.2d 474 (1983); *Favors,* 186 Ga.App. 480, 367 S.E.2d 328. But Mills has not alleged that Amoco was negligent in hiring any of the employees who harassed her, nor does she otherwise allege facts supportive of a

---

**18.** There is no disagreement that Georgia law is the applicable state law.

**19.** Moreover, the state claim adds nothing to this litigation from Mills' point of view. The federal

cause of action, if proven, will provide sufficient redress. If anything, the state claim requires proof of an even higher standard than the federal claim.

cause of action for negligence against Amoco. *See Cox,* 165 Ga.App. 888, 303 S.E.2d 71.

### B. *Plaintiffs' motions*

The Court herein denies Amoco's summary judgment motion on Plaintiffs' federal claims without regard to or reliance on the evidence concerned in Plaintiffs' two motions. As those motions are now moot, they need not be addressed.

## III. CONCLUSION

Defendant's Motion for Summary Judgment is **GRANTED IN PART AND DENIED IN PART.** Plaintiff Mills' state law claim for intentional infliction of emotional distress is **DISMISSED.** Plaintiffs' federal claims will proceed to trial. Plaintiffs' Motion to Strike Unsworn Statements and Plaintiffs' Motion to Strike Affidavit of John Penny or in the Alternative to Take Further Deposition Testimony are **DENIED** as moot.